UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ALI BAHAR | : | Case No. C-1-01-798 |
| | : | J. Watson |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| CITY OF CINCINNATI | : | **PLAINTIFF'S TRIAL BRIEF** |
| | : | |
| Defendant. | : | |

**I.   INTRODUCTION**

Ali Bahar filed his Complaint on November 20, 2001, alleging claims of national origin discrimination under federal and state law, retaliation under federal and state law, promissory estoppel, and wrongful discharge in breach of Ohio public policy.  On September 27, 2002, Bahar filed a second Complaint alleging claims of national origin discrimination under federal and state law, retaliation under federal and state law, and wrongful discharge in breach of Ohio public policy.  On February 11, 2003, the Court consolidation the two matters.

The Defendant filed a Motion for Summary Judgment on November 7, 2003 which was denied by Judge Susan J. Dlott on January 12, 2004.  Following a Final Pre-Trial Conference with Judge William O. Bertelsman on November 15, 2004, the Plaintiff has agreed not to pursue a claim for promissory estoppel.

**II.   STATEMENT OF FACTS**

Plaintiff was born in Iran and immigrated to the United States to attend college.  (Bahar Dep. at 7-8.)  Plaintiff became employed by the Metropolitan Sewer District of the City of Cincinnati ("MSD") in 1988.  (Bahar Dep. at 9.)  Plaintiff began his tenure with MSD in the Wastewater Treatment Division.  Id.  He worked as a Mechanical Engineer in operation and maintenance of the treatment processes.  Id.  In 1992, Plaintiff was recruited to work in a new division called Planning and Program Management.  Id.

The Planning and Program Management Division was established in 1992-1993 in order to ensure that more of the projects that had been planned were actually built. (Niehaus Dep. at 9-10). Quinn, then the Director of MSD, told his assistant director, Joseph Niehaus, to recruit the best people possible to fill the positions available in the new division. (Niehaus Dep. at 11). Niehaus recruited Plaintiff into the new department. (Niehaus Dep. at 9). Plaintiff was classified as an engineer in training, and he worked as a Project Manager. (Niehaus Dep. at 12-13.) Niehaus testified that Plaintiff was one of the top two employees in this division. (Niehaus Dep. at 21-22). Quinn confirmed that Plaintiff was one of the top performers in the department. (Quinn Dep. at 27-28.)

Quinn resigned as Director of MSD in 1998 and was replaced by Patrick Karney. (Quinn Dep. at 6). Niehaus retired from MSD as Assistant Director in 1998, and was replaced by Robert Campbell. (Niehaus Dep. at 6, Campbell Dep. at 6). The change in administration resulted in a starkly different workplace for Plaintiff.

On or about August 18, 2000, the Defendant reclassified Plaintiff and five other employees from the position of Engineer in Training to Senior Engineering Technician. (Johnson Dep., Exs. 2 and 3.) The Senior Engineering Technician position is also known as a Civil Engineer Technician IV ("CET-4"). (Campbell Dep. at 37.) The articulated reason for the change in classification for Plaintiff and his co-workers was that they had served in the position of Engineer in Training longer than the maximum allowed time of 10 years. (Johnson Dep., Ex. 2.) At the time of the reclassification, Plaintiff was transferred to the Wastewater Collection Division. (Campbell Dep. at 38.)

Plaintiff had no input into the decision to transfer him from the Wastewater Collection Division to the Wastewater Collection Division. (Campbell Dep. at 38.) Plaintiff believed that the transfer to the Wastewater Treatment Collection Division was punitive in nature and advised

the Defendant of his concerns. (Karney Dep. at 45.) Plaintiff advised the Defendant that he was the only Engineer in Training that had been reclassified and to also have been transferred to another Division other than Sohail Saeed, a Pakistan born employee. (Bahar Dep. at 30-31, Johnson Dep., Ex. 4.) Plaintiff advised the Defendant that "as of Monday, August 21, 2000, I have reported to Wastewater Collection with the new responsibility of <u>overseeing manhole rehabilitation program</u>. I feel that discrimination is the only factor in how Mr. Huang, Mr. Donepudi and I have been treated." (Johnson Dep., Ex. 4.)

Julia Johnson, Superintendent for MSD (Johnson Dep. at 6), testified that she was aware of Plaintiff's concerns, that she did nothing to investigate Plaintiff's concerns regarding his transfer to Wastewater Collection, and that it was her role to investigate claims of discriminatory treatment "if there is an issue." (Johnson Dep. at 43-44.)

The Wastewater Collection position was a less desirable position than the position in Wastewater Engineering previously held by Plaintiff. Wastewater Collection was referred to as "the hole" and the department was considered a "punishment place." (Bahar Dep. at 38-39.) Campbell concedes that the Wastewater Engineering Department was considered more valuable than the Wastewater Collection Department. (Campbell Dep. at 47.) Plaintiff was given no office furniture and had to sit on a table for a few weeks. (Bahar Dep. at 39.) When Plaintiff inquired about the arrival of his office furniture, no one would tell him when or if he was going to get any. (Bahar Dep. at 39.) Additionally, Plaintiff was not given meaningful work to do while in Wastewater Collection. For example, Plaintiff was assigned the tasks of making maps of sewer systems, work which was normally assigned to CET-1 and CET-2 employees. (Bahar Dep. at 200-201.) These responsibilities were vastly inferior to his previous duties as Project Manager. Plaintiff was not performing any engineering work as a CET-4. (Bahar Dep. at 38.)

Plaintiff received his Professional Engineer's license in February, 2002. (Johnson Dep. Ex. 5). The Professional Engineer's license is a license administered by the state of Ohio. (Karney Dep. at 18.) Historically, an MSD employee was automatically promoted to the position of Senior Engineer upon acquisition of the Professional Engineer's license. (Niehaus Dep. at 20, George Dep. at 52.) Campbell, however, balked at promoting Plaintiff. (Bahar Dep. at 47-48.)

After two months, on or about March 31, 2002, Plaintiff was promoted to the position of Senior Engineer pursuant to an order of the Civil Service Commission and transferred to the Stormwater Management Division (Bahar Dep. at 221, Karney Dep. at 33). Typically, employees received a ten percent raise in compensation upon promotion to Senior Engineer. (Bahar Dep. at 50.) Plaintiff received only a five percent raise in compensation. (Bahar Dep. at 50.) At the time Plaintiff received his Professional Engineer's license, there were at least two project manager positions open in mechanical engineering, Plaintiff's area of expertise. (Bahar Dep. at 48.) Plaintiff, however was transferred to the Stormwater Management Division, a separate division of the Department of Sewers. (Karney Dep. at 85.)

### III. PLAINTIFF WILL PRESENT EVIDENCE THAT ESTABLISHES NATIONAL ORIGIN DISCRIMINATION

Federal and Ohio law prohibit national origin discrimination in employment decisions. 29 U.S.C. §623; O.R.C. §4112.02(A). Plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination. Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." Id.

Under the circumstantial evidence approach, Plaintiff may create a presumption of discrimination pursuant to the McDonnell Douglas framework by proving the following elements: (1) he was a member of a protected class; (2) he was qualified for the job he held; (3) he suffered an adverse employment action; and (4) he was replaced by or treated differently than similarly situated employees outside the protected class. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998); Ohio Civil Rights Commission v. Ingram, 69 Ohio St.3d 89, 92 (1994) (Ohio courts apply federal law on state discrimination claims).

Once Plaintiff succeeds in establishing a *prima facie* case, Defendant must present some legitimate, nondiscriminatory reason for the termination. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). If Defendant meets this burden of production, Plaintiff must then show that Defendant's articulated reason for the termination is a pretext for national origin discrimination. Id. at 507. In Hicks, the Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, [n]o additional proof of discrimination is required.

Id. at 511 (emphasis in original; footnote and citation omitted). Thus, the employee need not produce *additional* evidence of discrimination. As the Supreme Court clarified in Reeves v. Sanderson Plumbing, 530 U.S. 133, 149 (2000), a plaintiff's *prima facie* case combined with sufficient evidence to find that the employer's asserted justification lacks credibility will permit the trier of fact to infer that the employer was motivated by unlawful discrimination. In Reeves, the Supreme Court unanimously and authoritatively rejected the pretext-plus approach that several

5

circuits had used previously in ruling on motions for summary judgment. Id. at 140-41. The Court held that the Fifth Circuit had "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." Id. at 149.

In this case, Defendant concedes, and the evidence will demonstrate, that Plaintiff's Iranian nationality makes him a member of a protected group and that Plaintiff was qualified for the positions he held. (Def. MSJ at 7).

Defendant disputes that Plaintiff can demonstrate he suffered an adverse employment action or that he was treated less favorably than individuals outside the protected class of United States born individuals.

> A. **The Evidence Will Demonstrate Plaintiff Was Subject to a Materially Adverse Employment Action When Defendant Stripped Him of Many Job Duties And Refused to Assign Work to Him**.

In her order denying Defendant's Motion for Summary Judgment, Judge Dlott correctly noted that even if Bahar did not suffer a reduction in pay or benefits, he may still establish he suffered an adverse employment action. Judge Dlott found that, "a materially adverse change might be indicated by…. significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Order Denying Defendant's Motion for Summary Judgment at p. 3, *citing* Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999).

The evidence at trial will establish that Defendant stripped Plaintiff of a significant portion of his job duties when it transferred him to Wastewater Collection, and Defendant refused to replace those duties with meaningful assignments. Plaintiff's supervisors gave him few projects on which to work and Defendant quickly removed even those few projects. (Bahar Dep. at 35, 200-201). Defendant did finally assign to a project to Plaintiff making sewer maps which is work normally assigned to CET-1 and CET-2 employees. (Bahar Dep. at 201). MSD employees referred to Wastewater Collection as "the hole" and considered it a "punishment

place." (Bahar Dep. at 38-39). Upon his transfer to Wastewater Collection, Defendant did not supply Plaintiff with a chair, forcing him to sit on his desk for the first week he was there. (Bahar Dep. at 39-40). When Plaintiff attempted to obtain a chair, Wastewater Collection personnel told him that they did not have any chairs that Plaintiff could use, and they did not know when any chair would be ordered for him. (Id.). Plaintiff did not perform any engineering work as a CET-4. (Bahar Dep. at 38.)

  **B.  The Evidence Will Establish That Plaintiff Was Treated Less Favorably Than Employees Outside The Protected Class.**

  Plaintiff will introduce evidence that he was treated less favorably than employees outside the protected class. Defendant issued a written warning to Plaintiff on or about July 10, 2000 stating that Plaintiff had failed to follow proper procedure in modifying a design contract. (Huang Dep. Ex. 3.) Other American born employees had received permission to modify orders as had Bahar, and they were not disciplined. (Bahar Dep. at 79-80.)

  Plaintiff advised Campbell that the former Director, Quinn, had approved the change order but Campbell did not speak with Quinn regarding Plaintiff's assertion even though he had the opportunity to do so. (Campbell Dep. at 24, 26, 75.) Campbell's "investigation" of the alleged policy infraction disclosed that other supervisors had agreed that Quinn could indeed have given Bahar verbal authorization to make the change order. (Campbell Dep. at 36.) Plaintiff's immediate supervisors at the time the change order was made did not receive disciplinary action for the event. (Campbell Dep. at 58-59.)

  Niehaus confirmed that it was quite possible Quinn had verbally approved the change order. (Niehaus Dep. at 53-55.) Niehaus further testified that he had received a call from MSD regarding the change order after his retirement. (Niehaus Dep. at 47.) Niehaus checked his appointment book to see if he had a notation regarding a meeting with Quinn regarding the

7

change order. (Niehaus Dep. at 47.) Niehaus informed MSD that "whether or not I have something written down or don't have written down, that doesn't necessarily mean I was or wasn't there with a lot of meetings . . . I can't tell you whether I was there or wasn't there. Whether the meeting happened or didn't happen." (Niehaus Dep. at 47-48.) Campbell told a different story to Karney, however, in his memo regarding his investigation. (Karney Dep. Ex. 1.) "Mr. Niehaus, know (sic) for good notes, reviewed his notes but could not find a reference to this project change in scope." Id. Plaintiff's appointment calendar, on the other hand, does note a meeting with Quinn wherein the change order was discussed. (Bahar Dep. at 74.)

Quinn confirmed that he had given verbal approval on many occasions to accept a change order. (Quinn Dep. at 24, 34-36.) Huang had determined that it was standard operating procedure for Quinn to give verbal authorization to change orders, that he did not think the written warning was fair to Plaintiff, others had made change orders with verbal approval, but Campbell and Karney nonetheless ordered that he reprimand Plaintiff. (Huang Dep. at 28-29, 44, 52-53, 59.)

There is also evidence that when the Engineers in Training who held the position for ten years or longer without acquiring their Professional Engineer's licence were re-classified, only Plaintiff and Saeed, a Pakistan born employee, were transferred out of their divisions. (Bahar Dep. at 30-31, Johnson Dep., Ex. 4.)

Additionally, there is evidence that Plaintiff was denied at least two promotions in favor of American born employees who were less qualified for the positions than Plaintiff. Plaintiff applied for the position of Facility Manager on or about April 30, 2001. Rick Schmidt was awarded the position. (Bahar Dep. at 119-121.) Schmidt, an American born employee, did not posses a Professional Engineer's licence. (Donepudi Dep. at 42-43.) Schmidt did not have any

project management experience, nor did he posses a engineering degree. (Bahar Dep. at 121-122.)

On or about December 18, 2000, Plaintiff applied for the position of Supervisor of Manhole Rehabilitation in Wastewater Collection. (Plaintiff's Application, attached as Ex. E.) Plaintiff was rejected in favor of Cindy Kron, an American born employee. (Bahar Dep. at 131.) Kron did not have a college degree, nor did she have any experience with manholes. (Bahar Dep. at 133.)

### C. The Evidence Will Demonstrate That Defendant's Articulated Reasons For The Adverse Employment Action Were Pretextual.

To establish that Defendant's explanation for the termination is unworthy of belief, Plaintiff may show that (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate the adverse action, or (3) they were insufficient to motivate adverse action. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The first type of proof requires that Plaintiff show that the bases for the termination never happened or are factually false. Id. The second type of proof consists of a demonstration that "an illegal motivation was more likely than [the reasons] offered by the defendant." Id. The third type of proof consists of evidence that other American born employees otherwise similarly situated to Plaintiff were not treated differently. Id.

The evidence will demonstrate that the articulated reason for disciplining Plaintiff was insufficient to motivate the discipline because there is evidence Plaintiff followed MSD procedures and other employees had engaged in the same actions and were not disciplined. There is also evidence that Plaintiff and another foreign born employee were treated differently in that only they were moved out of their departments upon being reclassified to the CET-4 position. There is also evidence that Plaintiff was rejected for promotion in favor of less qualified individuals outside the protected class.

9

The evidence will also establish that Defendant took unwarranted adverse employment action against other foreign born employees. Evidence that the Defendant engaged in a pattern of national origin discrimination may establish Defendant's discriminatory intent. Reed v. County Miss, Inc., 1995 U.S. App. Lexis 14627, *11 (6th Cir. 1995).

Rao Donepudi, born in India, has been stripped of his duties with MSD. (Donepudi Dep. at 9.) Tony Huang, Taiwan born, was the former head of the Engineering Department with roughly 120 to 130 people reporting to him. (Huang Dep. at 16.) Huang currently has only one direct report, and his duties are considerably less meaningful than previously. (Huang Dep. at 9, 22-24.) Sam George, born in India, also had his supervisory responsibilities markedly reduced. (George Dep. at 13, 17.)

Finally, evidence will be introduced that Campbell made negative comments regarding Plaintiff's national origin in August 1999. During a conversation Campbell had with Plaintiff, Campbell inquired about Plaintiff's national heritage; when Plaintiff informed him he was Iranian, Campbell replied that was "too bad" and mentioned that his daughter was dating an Iranian. (Bahar Dep. at 190-191.)

### IV. PLAINTIFF WILL ESTABLISH THAT THE DEFENDANT RETALIATED AGAINST HIM FOR ENGAGING IN PROTECTED ACTIVITY

Retaliating against an employee because he opposed unlawful discrimination is expressly prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a) and O.R.C. 4112.02(I). The elements of a claim for retaliation are: (1) that plaintiff engaged in protected activity; (2) that his exercise of his civil rights was known to the defendant; (3) that he was the subject of adverse employment action; and (4) that a causal link existed between the protected activity and the adverse action. Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir. 1987).

To establish the causal connection required in the fourth element, Plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had he not engaged in protected activity. Avery Dennison, 104 F.3d at 861; Jackson v. RKO Bottlers, 743 F.2d 370, 377 (6th Cir. 1984). Although no one factor is dispositive in establishing a causal connection, evidence that Defendant treated Plaintiff differently from similarly situated employees or that the adverse action was taken shortly after Plaintiff's exercise of protected rights is relevant to causation. Gribcheck, 245 F.3d at 551 (citing Wrenn, 808 F.2d at 501); Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987).

Defendant concedes that Plaintiff engaged in protected activity and that Defendant knew about this exercise of protected rights. Plaintiff first complained to the Defendant's internal EEO office following the written reprimand on July 10, 2000 and before his reclassification on August 18, 2000. (Bahar Dep. Ex. 12.) Immediately thereafter, Plaintiff was reclassified to CET-4 and transferred out of his division. (Johnson Dep. Exs. 2-3.) On or about February 12, 2001, Plaintiff filed a charge of discrimination with the EEOC. Immediately thereafter, Plaintiff was denied the Facilities Manager position. (Bahar Dep. at 119-121.) Plaintiff filed a second charge of discrimination on or about May 31, 2001. Plaintiff filed a final charge on or about December 27, 2001, alleging that he had been discriminated against and retaliated against when denied the Facilities Manager position.

The evidence will demonstrate that the adverse employment actions endured by Plaintiff were virtually contemporaneous with his protected activity. Additionally, as outlined above, evidence will be introduced which establishes pretext with respect to the transfer out of his department and the denial of promotions.

## V. PLAINTIFF WILL ESTABLISH A PUBLIC POLICY CLAIM

The public policy of the State of Ohio provides an exception to the doctrine of employment at will. An employer cannot take adverse action against an employee for a reason that violates the articulated public policy of the State of Ohio. Painter v. Graley, 70 Ohio St. 3d 377 (1994). To establish a wrongful discharge in violation of public policy, Plaintiff must show that 1) a clear public policy exists; 2) The discipline imposed would jeopardize that public policy; 3) the discipline was motivated by conduct related to the public policy; and 4) Defendant lacked an overriding legitimate business justification for its action. Id.

Federal and state law clearly prohibit adverse employment action on the basis of an employee's national origin. Thus, Plaintiff has established the first two elements of the *prima facie* case.

The final two elements are essentially the same as the national origin discrimination and retaliation claims under Title VII and O.R.C. §4112. Thus the evidence presented in support of Plaintiff's discrimination and retaliation claims will establish that the Plaintiff's treatment was in violation of Ohio Public Policy.

## VI. ISSUES OF LAW (SUBSTANTIVE)

There are no special issues of law other than those implicit in the foregoing issues of fact and those contained in the jury instructions.

## VII. ISSUES OF LAW (PROCEDURAL)

There are no anticipated special issues regarding procedure.

## VIII. ISSUES OF LAW (EVIDENTIARY)

There are no anticipated special issues regarding evidentiary issues.

Respectfully submitted,

/s/ Kelly Mulloy Myers
Kelly Mulloy Myers (0065698)
Randolph H. Freking (0009158)
Trial Attorneys for Plaintiff
FREKING & BETZ
215 East Ninth Street, Fifth Floor
Cincinnati, OH  45202
(513) 721-1975/FAX:  (513) 651-2570
kmyers@frekingandbetz.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2005, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's System.

/s/ Kellly Mulloy Myers