1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF OHIO

3             WESTERN DIVISION

4                  - - -

5    ALI BAHAR,                    :   CIVIL NO. 1:01CV798

6              Plaintiff,          :   (Consolidated with
                                        CIVIL NO. 1:02CV697)
7        -vs-                      :
                                        First Day of Jury Trial
8    CITY OF CINCINNATI,           :
                                        Wednesday, January 19, 2005
9              Defendant.          :   Covington, Kentucky

10                 - - -

11        EXCERPT OF TRIAL PROCEEDINGS
            TESTIMONY OF JULIA JOHNSON
12    BEFORE THE HONORABLE MICHAEL H. WATSON, JUDGE
                    AND JURY

13                 - - -

14

15   For the Plaintiff:   Randolph H. Freking, Esq.
                          Kelly Mulloy Myers, Esq.
16                        Freking & Betz
                          215 East Ninth Street, Fifth Floor
17                        Cincinnati, Ohio  45202

18   For the Defendant:   Augustine Giglio, Esq.
                          Terrance A. Nestor, Esq.
19                        Assistant City Solicitors
                          Room 214, City Hall
20                        801 Plum Street
                          Cincinnati, Ohio  45202
21

22   Law Clerk:           Dorothy Gass

23   Courtroom Deputy:    Barbara Crum

24

     Court Reporter:      Julie A. Wolfer, RDR, CRR
25
                          - - -

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

1                              PROCEEDINGS

2                                 * * *

3              THE COURT:  Miss Johnson, if you'd please approach the

4      stand here and raise your right hand.

5         (Witness sworn by the courtroom deputy.)

6              THE COURT:  Are you comfortable?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  All right, Mr. Freking, you may begin.

9              MR. FREKING:  Thank you, Your Honor.

10                            JULIA JOHNSON

11                          CROSS-EXAMINATION

12     BY MR. FREKING:

13     Q.  Good afternoon, Miss Johnson.

14         Could you state your full name for the record, please?

15     A.  Yes.  Julia Louise Johnson.

16     Q.  Okay.  And by whom are you currently employed?

17     A.  The Metropolitan Sewer District.

18     Q.  Is that for the City of Cincinnati?

19     A.  That is Hamilton County agency operated by the City of

20     Cincinnati.

21     Q.  Right.  The City of Cincinnati operates the Metropolitan

22     Sewer District?

23     A.  That's correct.

24     Q.  They get funding from Hamilton County?

25     A.  That's correct.

1    Q.   Right?  But Hamilton County doesn't make the employment

2    decisions?

3    A.   No.   That's correct.

4    Q.   City of Cincinnati makes the employment decisions?

5    A.   That is correct.

6    Q.   And how long have you worked there?

7    A.   I've been there 18 years.

8    Q.   And what is your current title?

9    A.   I'm the superintendent of the wastewater administration

10   division.

11   Q.   And who do you report to?

12   A.   I report to Robert Campbell.

13   Q.   Mr. Campbell who is seated at counsel table for the City of

14   Cincinnati; is that correct?

15   A.   Yes.   Yes.

16   Q.   And you know he's one of the players in this particular

17   matter?

18   A.   Yes, I do.

19   Q.   You know he's one of the decision makers --

20   A.   Yes.

21   Q.   -- with respect to a reprimand and a transfer over to

22   wastewater collection?

23   A.   Yes, I'm aware.

24   Q.   And you knew he was a relatively new supervisor when he

25   reprimanded Mr. Bahar?

1    A.   Yes.

2    Q.   Mr. Campbell?

3    A.   Yes.

4    Q.   He had just come -- he had not worked at the City very

5    long, had he?

6    A.   He came, I think, in '99 or shortly thereafter.

7    Q.   He had worked someplace else; right?

8    A.   Yes, he had.

9    Q.   Do you know where that was?

10   A.   I think in St. Louis at their utility.

11   Q.   Okay.  St. Louis, Missouri?

12   A.   Yes.

13   Q.   And how long have you reported to Mr. Campbell?

14   A.   Started reporting to Mr. Campbell December of '03.

15   Q.   You sure it was December of --

16   A.   2003.

17   Q.   Oh.  And prior to that you reported to Mr. Karney?

18   A.   Yes.  That's correct.

19   Q.   And you know Mr. Karney is also a player in this case

20   because that's who Mr. Campbell reported to; is that correct?

21   A.   That's correct.

22   Q.   That Mr. Karney is the guy who came to you and actually

23   asked you about the ten-year rule with EIT?

24   A.   That is correct.

25   Q.   Now, what do you -- I'm sorry, what was your title?

1    A.   I'm the administrative superintendent.

2    Q.   And what does an administrative superintendent do?

3    A.   Okay.   It is the only nontechnical support service for the

4    utility and is over hiring, finances, inventory management,

5    safety, training, and EEO.

6    Q.   Okay.   So human resources is part of your -- is under your

7    umbrella of responsibility?

8    A.   That's correct.

9    Q.   That includes both EEO and other matters?

10   A.   That's correct.

11   Q.   Does the City have a disciplinary policy?

12   A.   Yes, it does.

13   Q.   And does that disciplinary policy apply to MSD?

14   A.   Yes, it does.

15   Q.   And is it a progressive discipline system?

16   A.   It is progressive discipline.

17   Q.   What does "progressive discipline" mean?

18   A.   It means that it starts with an oral reprimand between a

19   supervisor and then can proceed from that to written or from

20   that to suspension, loss of vacation time, or loss of money --

21   Q.   All right.

22   A.   -- demotion, or dismissal.

23   Q.   And oral, oral warnings are normally the first step in the

24   progressive discipline system?

25   A.   It does not have to be.

1    Q.   It doesn't have to be, but normally you would orally warn

2    somebody before you write them up?

3    A.   Not necessarily, no.

4    Q.   Normally that's the case?

5    A.   No.

6    Q.   Not normally.  Normally is get to a written reprimand right

7    off the bat?

8    A.   A written reprimand can be your first order of giving, yes.

9    Q.   I understand it can be.  Are you saying normally the City

10   skips the first step or normally the City starts at the first

11   step?

12   A.   The first step of the official process --

13   Q.   Right.

14   A.   -- is normally where the supervisor and the employee talks.

15   Q.   Right.

16   A.   Okay.  But the official -- the official beginning step of

17   the process is a written reprimand.

18   Q.   Okay.  I thought when you just told me what progressive

19   discipline was, you said the first step is an oral warning?

20   A.   Is a meeting with the supervisor, yes.  An oral.  That is a

21   conversation between the two.

22   Q.   Okay.

23   A.   And then it can proceed then to the first official piece

24   which is a written reprimand leading to the other steps I

25   mentioned before.

1    Q.   Okay.

2              THE COURT:   Excuse me.

3              Miss Johnson, push that microphone away just a little

4    bit.

5              THE WITNESS:   There.

6              THE COURT:   There.   That's better.   Okay.

7    Q.   So what you described before at the first step you really

8    meant to say the first unofficial step?

9    A.   The first unofficial step that does not require any written

10   documentation --

11   Q.   Does not --

12   A.   -- is a meeting between -- that's correct.

13   Q.   All right.   Were you involved in the counseling of

14   Mr. Bahar at all when he received his written reprimand?

15   A.   No, I was not.

16   Q.   Were you -- you were involved in the process; right?

17   A.   At some steps of the process, yes.

18   Q.   Okay.   Did anybody ever come to you and ask your advice as

19   to whether or not he ought to get an oral warning first?

20   A.   No.

21   Q.   Did anybody ever suggest that to you?

22   A.   No.

23   Q.   Like maybe do you know whether Mr. Campbell knows the

24   progressive discipline policy?

25   A.   I do not know that.

1    Q.   Should he?

2    A.   Most all of the supervisors should know, but oftentimes

3    much of what I deal with on a daily basis is people inquiring

4    about the process.

5    Q.   Well, you've worked with Mr. Campbell for a few years now?

6    A.   Yes, I have.

7    Q.   Do you believe he's aware of progressive discipline policy?

8    A.   Yes, I do believe he's aware of it, yes.

9    Q.   All right.  Great.

10        Now, I understand that you're familiar somewhat with

11   Mr. Bahar's background; correct?

12   A.   Yes, I am.

13   Q.   And you're aware that Mr. Bahar was reclassified in August

14   of 2000 from EIT, engineer-in-training, to some other position?

15   A.   Yes.

16   Q.   Right?

17   A.   Yes.

18   Q.   Okay.  That was August of 2000?

19   A.   Yes.

20   Q.   And you've worked -- had an HR responsibility for how long

21   prior to that?

22   A.   About a couple months prior to the actual initiation of the

23   document.  We were doing research and working with the City.

24   Q.   Now, my question is how long had you been in HR?

25   A.   How long have I been in HR?

1  Q.  Yeah.

2  A.  Was a part of the City's HR department before I came to the

3  Metropolitan Sewer District.

4  Q.  So you've been in HR for how many years?

5  A.  I started in City HR in about '89.

6  Q.  Prior to Mr. Bahar and others getting reclassified in

7  August of 2000 from their EIT position because of a ten-year

8  rule --

9  A.  Yes.

10  Q.  -- okay, when was the last time that you're aware of the

11  company ever -- the City ever enforcing that ten-year rule?

12  A.  At the District, that was the first time.

13  Q.  That was the first time in the history?

14  A.  It was the first time, yes.

15  Q.  Okay.  Because you know Mr. Bahar had worked as an EIT,

16  this ten-year rule, you're saying between 1989 and 2000 you're

17  not aware of anybody ever being reclassified due to a ten-year

18  rule?

19  A.  Okay.

20  Q.  Is that what you're saying?

21  A.  My problem -- may I correct the '89?  I started in central

22  HR in the latter part of the '70s.  I came to the Metropolitan

23  Sewer District in 1986.

24  Q.  Okay.

25  A.  So '89 was incorrect.

1    Q.   Okay.  So between '79 and 2000, were you ever aware of an

2    EIT being changed to a different classification because of the

3    ten-year rule?

4    A.   Okay.  Yes.  At the District there were some people that

5    were changed from '86 to -- to other titles that was like CET,

6    yes.  I am correcting myself.

7    Q.   In 1986 or 1987 that happened; right?

8    A.   Between '86 and present, yes.

9    Q.   Well, as a matter of fact, on the previous occasions when

10   this had happened in the '80s, isn't it correct that those

11   people got steps up -- step-ups in their job titles, they went

12   from EIT to CET-5 rather than 4?

13   A.   A CET-5 would be a promotion.

14   Q.   Right.  And these EITs who were reclassified in the '80s

15   were made CET-5s?

16   A.   Not -- not as a matter of changing their titles to it.  The

17   process is -- requires in the description that it be a lateral

18   move.  In order to move to a CET-5, you must ask the City of

19   Cincinnati to promote the individual on some other skill sets

20   other than that.  So it's not lateral, no.

21   Q.   Well, anybody in the '90s get reclassified from EIT to CET

22   something?

23   A.   I would say with my explanation when I just explained to

24   you was from the '86 period leading through, so yes.

25   Q.   Can you identify any person who was an EIT during the

1    decade of the 1990s that was reclassified as a result of the

2    ten-year rule?

3    A.  I know that it happened, sir.  The names I cannot tell you

4    at this point, but I do know that that -- it did happen.  I

5    know that they were a part of the engineering division and that

6    they then -- their titles were changed.

7    Q.  And presumably the City can obtain that data and present

8    it?

9    A.  Absolutely.  Yes.

10   Q.  All right.  Great.

11       Could you look at the exhibit book in front of you?  I

12   think it might be a blue binder.  Do you see that?  It's -- I

13   don't know whether it's blue or not.

14       Is that one that has City of Cincinnati on the front of it?

15   A.  Yes.

16   Q.  Can you look at the other one?

17           COURTROOM DEPUTY:  Sorry about that.

18   Q.  Ma'am, in your job are you familiar generally with human

19   resource documents for the City of Cincinnati?

20   A.  Yes, I am.

21   Q.  Okay.  Could you look at the very first exhibit in that

22   book?

23   A.  Yes.

24   Q.  Plaintiff's Exhibit Number 1.

25   A.  Okay.  Yes.

1    Q.   What is that document?

2    A.   That is an official application for the City of Cincinnati.

3    Q.   All right.  By Mr. Bahar; is that correct?

4    A.   Yes, it is.

5    Q.   And on the fourth page does it indicate the date he was

6    applying for a job?

7    A.   Yes.

8    Q.   Okay.  Also indicates that he was presently employed in

9    Louisville, is that correct, at that time?

10   A.   That is correct.

11   Q.   Because one of the questions you asked him at the bottom

12   here when he was applying for a job, you know, whether the City

13   could contact his present employer without contacting him

14   first, and he said yes?

15   A.   Yes.

16   Q.   Is that correct?

17   A.   Yes.

18   Q.   And after this application he was hired; is that correct?

19   A.   That is correct.

20   Q.   And do you recall that his first position with the City of

21   Cincinnati was as an engineer-in-training?

22   A.   Yes, it was.

23   Q.   Which goes by the initials of EIT?

24   A.   That's correct.

25   Q.   And he was hired sometime in 1988; is that correct?

1    A.    Yes.

2    Q.    Now, could you turn in the exhibit book, please, to Exhibit

3    Number 2?

4    A.    Yes.

5    Q.    And if you could identify that document, please.

6    A.    That is the official performance rating system or form for

7    the City of Cincinnati.

8    Q.    All right.  And page 2-1 appears to be the 1989 performance

9    review for Mr. Bahar; is that correct?

10   A.    That is correct.

11         MR. FREKING:  Your Honor, I move for the admission of

12   Plaintiff's Exhibit 2-1.

13         MR. NESTOR:  No objection.

14         THE COURT:  Very well.

15         MR. FREKING:  Thank you.

16         THE COURT:  And by "very well," I mean admitted.

17         MR. FREKING:  Thank you.

18   Q.    Okay.  Yeah.  Up here it's kind of hard to read.  That's

19   his title, right, in the upper right-hand corner,

20   engineer-in-training; right?

21   A.    That's correct.

22   Q.    And will you -- do you see those categories of performance

23   there?

24   A.    Yes, I do.

25   Q.    From somebody may be inadequate, hopefully we don't have

1    too many X's in those boxes; is that correct?

2    A.   Yes.

3    Q.   To outstanding?

4    A.   Yes.

5    Q.   And there is a scale of zero to a hundred; right?

6    A.   That's correct.

7    Q.   And on this particular evaluation, this was probably his

8    first evaluation, that first annual evaluation since he started

9    in 1988?

10    A.   Yes.

11    Q.   And it looked like he basically got 80s, 85s, 90s, and his

12    overall score was 85; is that correct?

13    A.   That's correct.

14    Q.   And which means somewhere between normal and superior

15    performance?

16    A.   It's, yes, a higher number.   Yes.

17    Q.   And this was signed off by his boss at the time, and the

18    comment section the boss commends -- commends Mr. Bahar for

19    being an excellent employee?

20    A.   That's correct.

21    Q.   Could you turn in the exhibit book, please, to Exhibit 2-2?

22    This appears to be a second performance review; is that

23    correct?

24    A.   That's correct.

25    Q.   And this is from 1991?

1    A.    1990.

2    Q.    And what is his performance score on that particular --

3    even though it looks like '91 down here, it's actually a '90,

4    isn't it?

5    A.    It isn't --

6    Q.    Because up here --

7    A.    That's correct.

8    Q.    It says -- well, 12/22/90; right?

9    A.    That's correct.

10           THE COURT:  Mr. Freking, are you moving this document?

11           MR. FREKING:  I'm sorry.  Move for admission of

12   Exhibit 2-2.

13           THE COURT:  And just to cut through the chase, are we

14   going to use all of this document or we're eventually --

15           MR. FREKING:  Eventually.  Why don't I move for the

16   entirety of Exhibit 2 from one through the last page.

17           MR. NESTOR:  No objection.

18           THE COURT:  Very well.  The Court will admit PX 2, 2-1

19   through 24, it looks like.

20           MR. FREKING:  Thank you, Your Honor.

21   Q.    And in this 1990 review, it's correct that his performance

22   went up to a 90?

23   A.    That is correct.

24   Q.    From 85?

25   A.    Yes.

1    Q.   And 90 is at the low end of the superior category; is that

2    correct?

3    A.   That's correct.

4    Q.   All right.  Next one is 2-3.  And I won't belabor all of

5    these.  I just want you -- 2-3 is another personnel evaluation

6    from the following year; is that correct?

7    A.   That's correct.

8    Q.   Again, in 19 -- a 90 score?

9    A.   That's correct.

10   Q.   Okay.  19 -- the next exhibit, PX 2-4, is 1992 review,

11   again, a 90 score?

12   A.   That's correct.

13   Q.   With a comment:  "Mr. Bahar is definitely a superior

14   employee.  Pure and simple, he gets things done and done well."

15   A.   That's correct.

16   Q.   Was the comment of his boss?

17   A.   Yes.

18   Q.   That's 1992.

19        1993, Exhibit PX 2-5, he's getting even better, he's moving

20   up to a score of 95; right?

21   A.   That's correct.

22   Q.   And down at the bottom, the manager's comments, do you see

23   writing I've just underlined?

24   A.   Yes.

25   Q.   He's referred to here, even though he's an

1  engineer-in-training, he is described by his boss as a project

2  manager?

3  A.  That's correct.

4  Q.  An outstanding one at that; is that correct?

5  A.  That's correct.

6  Q.  In reviewing these records, were you aware of the fact that

7  he was considered a project manager as while he was an EIT?

8  A.  Yes.  From reviewing these documents, yes.

9  Q.  And then up in the comments section it was noted that he's

10  looking out for the District's interests when making a

11  purchase?

12  A.  Yes.

13  Q.  So he's making sure that he's getting a good deal on

14  whatever money is being spent?

15  A.  Yes.

16  Q.  Okay.  Next one, PX 2-6, 1994 review.  Again, still a 95?

17  A.  Yes, it was.

18  Q.  If you look at the bottom line of the comments section,

19  he's again referred to as a project manager?

20  A.  Yes.

21  Q.  And I think he's called an outstanding project manager;

22  correct?

23  A.  That is correct.

24  Q.  And his boss at that time was a fellow by the name of

25  Thomas Schwiers?

1    A.   That is correct.

2    Q.   1995 review is next.  Again, he gets a 95?

3    A.   That's correct.

4    Q.   And, again, it's Mr. Schwiers; right?

5    A.   That's correct.

6    Q.   Rating him as a 90 or 95 in every single job performance

7    category?

8    A.   That's correct.

9    Q.   The 1996 review, Mr. Schwiers still signing off on these,

10   and it's still a 1995 -- I'm sorry, a 95 performance

11   evaluation; is that correct?

12   A.   That is correct.

13   Q.   I'll have you look at the next exhibit which is PX 2-9.

14   This is his 1997 review.  So far he's doing pretty good; right?

15   A.   That's correct.

16   Q.   Next review, again, he's given a 95?

17   A.   That's correct.

18   Q.   Right?  And could you just read that last sentence of the

19   comments section above Mr. Schwiers' signature?

20   A.   The entire thing?

21   Q.   Just the last sentence there.

22   A.   Okay.  "Mr. Bahar does as much and more work than managers

23   with a higher title."

24   Q.   Do you know what the higher titles were that Mr. Schwiers

25   was referring to?  What would be a higher title in that

1    particular division?

2    A.   That would be engineers, senior engineers, principals.

3    Q.   Okay.

4    A.   Supervising engineers.

5    Q.   All right.  Okay.  The next exhibit in the exhibit book,

6    1999 review again by Mr. Schwiers, again a 95; is that correct?

7    A.   It's a '99 or the '98?

8    Q.   How does the '98 one look?

9         Do you know what, I think I took that out of our book.

10        '98 also a 95?

11   A.   That is true.

12   Q.   I think I displayed that during opening statement.

13        And the 1999 review, he's rated overall 95; is that

14   correct?

15   A.   That's correct.

16   Q.   As a matter of fact, it looks like in every single

17   performance category he is rated a 95?

18   A.   That's correct.

19   Q.   Must be pretty hard to get a hundred, huh?  Because even

20   this guy can't get a hundred.

21   A.   It's very difficult.

22   Q.   All right.  Okay.  Great.  Thank you very much.

23        Then if you would look past Plaintiff's to Plaintiff's

24   Exhibit Number 3, and there's two pages there.  Do those appear

25   to be letters of commendation that Mr. Bahar has received

1    during his career?

2    A.   That is correct.

3    Q.   One from the superintendent of wastewater treatment, and

4    the other one a professional reference it looks like from the

5    City of Madeira, from the city manager?

6    A.   The first one I have is from Mr. George, Sam George.

7    Q.   Right.   The first one is from Sam George?

8    A.   Principal engineer, SMU.

9    Q.   I'm sorry, that was to the superintendent.   I'm sorry.

10   You're right.   It was from Mr. George.

11       And the second one is from the City of Madeira in Ohio?

12   A.   That's correct.

13   Q.   Do engineers that are working in wastewater engineering

14   sometimes interact with officials from other municipalities

15   around the City of Cincinnati and Hamilton County?

16   A.   I would have to do an assumption.   I don't work in the

17   unit.   I would say so, assume so.

18   Q.   But they do the work for all of Hamilton County, right,

19   MSD?

20   A.   Yes.

21   Q.   And do they do work beyond Hamilton County?  What's called

22   metropolitan, does it cover like Northern Kentucky or

23   southeastern Indiana, or is it just Hamilton County?

24   A.   It is Hamilton County.

25   Q.   Okay.   All right.   Thank you.

1      Now, you're familiar with the fact that Mr. Bahar had been

2  engineer-in-training for ten years as of sometime in June of

3  1998, is that correct, ten years after he started?

4  A.  It was, I think, yes, in '98, yes.

5  Q.  In 1998 did anybody in human resources, MSD, anywhere else

6  in the City, say, well, he's now the ten-year rule, we need to

7  reclassify him?

8  A.  From City HR?

9  Q.  From anywhere within Hamilton County, the City, the state,

10  the Federal Government?  Did anybody suggest that he be

11  reclassified when he reached the ten-year rule?

12  A.  No.  No one suggested that.

13  Q.  Did anybody order it in 1998?

14  A.  The reclass in '98?

15  Q.  Yeah, did anybody --

16  A.  No.

17  Q.  -- suggest that -- because supposedly this rule that you

18  implemented or that the City implemented in 2000 was a rule

19  that the City had at least at one time that said after you

20  serve for ten years as an EIT, you should be reclassified; is

21  that correct?

22  A.  No.  It is part of the engineer-in-training classification

23  specification.

24  Q.  Okay.

25  A.  That indicates the ten years.

1    Q.   All right.  So according to this rule, supposedly after ten

2    years you should be reclassified?

3    A.   After ten years you should be reclassified to an

4    administrative or technical title.

5    Q.   Why wasn't he reclassified when he hit the ten-year rule in

6    1998?

7    A.   I would -- sir, I would wager to say that at that time the

8    motivation that moved this action was an organization in need

9    of engineering skills.  And prior to that time that had not

10   been discussed.  Prior to 2000 that had not been a need where

11   we needed to go out and hire licensed engineers.

12   Q.   So you enforce the rule when you need to and you don't

13   enforce it if you don't need to?

14   A.   No, I wouldn't say that.

15   Q.   Well, it is a ten-year rule, supposedly after ten years an

16   EIT should be reclassified?

17   A.   It is a rule on the basis that we hope that our engineers

18   in training will not take ten years in order to get a

19   professional license.  It's there in the class spec, and part

20   of that is the need of the organization.  If the organization

21   needs it, it's a way of holding harmless the employee because

22   the employee is not -- is not demoted.  The employee does not

23   lose money.  They are then laterally put in an administrative

24   or technical title.  So in 2000 there was a need for us to get

25   more engineering skills.

1    Q.  I think what you just said was that the ten-year rule is

2    enforced if there is a need.

3    A.  The ten-year rule is a part of the classification, sir, of

4    the engineer-in-training class spec.  It does say that a

5    individual has up until ten years in order to get their

6    professional license.

7    Q.  And what happens if they don't get it within ten years?

8    A.  It also speaks in that same classification specification

9    that if they do not and they are not successful, then they are

10   laterally moved to a position title, reclassify.

11   Q.  Right.

12   A.  As we did.

13   Q.  No, you didn't in 1998; right?  You just said if they

14   reached the ten years and they have not obtained their P.E. --

15   A.  No.

16   Q.  -- then they get laterally reclassified or moved.

17   A.  Okay.  But I did not say it was an automatic once you get

18   ten.

19   Q.  It's discretionary --

20   A.  I said it's based --

21          THE COURT:  One at a time, folks.  One at a time.

22   Q.  Okay.  So I'm sorry.  Maybe the bottom line of all this is

23   whether or not to apply the ten-year rule is discretionary?

24   A.  No, it isn't.

25   Q.  Is it automatic?

1   A.   It's based on the need of the organization.   And what I

2   just said earlier was the department was in need of engineering

3   skills, going in advertising and bringing in professional

4   engineers in order to perform the work of our capital program.

5   Based on that need, we began to move toward filling positions,

6   getting professional engineers.

7   Q.   So you're saying that there was no need for these

8   engineering skills in '98 or '99 but there became a need in

9   2000?

10  A.   In 2000 the need was expressed by our administration.

11  Q.   Right.

12  A.   In '98 when Mr. Bahar got -- the ten years was there, there

13  was not an expressing of the administration at that time for

14  hiring a large number of engineers or engineers.

15  Q.   How many P.E.s were hired in 2000 before Mr. Bahar was

16  reclassified in wastewater engineering?

17  A.   I --

18  Q.   Where he was working?

19  A.   I could not offhand tell you the number, but I can tell you

20  that we hired professional engineers.

21  Q.   More than ten?  More than five?  More than two?

22  A.   I would say more than two, yes.

23  Q.   Prior to August 21st of 2000 you're saying that, or are you

24  saying sometime thereafter?  Because he was moved on August

25  21st or 22nd of 2000.

1   A.   In August of 2000 was when we did the reclassification --

2   Q.   I understand that.

3   A.   -- in order to free up the positions in order to hire the

4   engineers.

5   Q.   Did you hire a professional engineer right away?

6   A.   Beyond that with advertisement and all of that period with

7   the City of Cincinnati process which is not quick, we did hire

8   engineers.

9   Q.   Eventually; right?

10  A.   Well, as soon as we could get them hired.

11  Q.   Why didn't you wait until you had somebody hired before you

12  moved Mr. Bahar from the position because in fact he had

13  engineering skills?

14  A.   Okay.   Your first question was why didn't we wait?

15  Q.   Right.

16  A.   The process I'm explaining is the position is not vacant

17  when our -- or available to place someone else in when you have

18  an engineer-in-training in it.   Part of the City's process is

19  you have an engineer position of which the trainee sits there,

20  and the only way that the position becomes available to be

21  advertised and hire is that it is vacant on the control

22  documents and City of Cincinnati sees it as vacant so we could

23  advertise and approve it.

24  Q.   Now, backing up a little bit, you're aware that Mr. Bahar

25  was reprimanded by Mr. Campbell, well, because of

JOHNSON - CROSS

1    Mr. Campbell's recommendation?

2    A.   Yes, I'm aware.

3    Q.   And during your tenure with HR being under your umbrella,

4    had Mr. Bahar ever been reprimanded or disciplined or counseled

5    or given an oral warning previously?

6    A.   No, he had not.

7    Q.   Do you know whether Mr. Campbell considered giving

8    Mr. Bahar an oral warning instead of a written reprimand that's

9    documented that goes in the file?

10    A.   No, I do not know.

11    Q.   At some point because they wanted to give him a written

12    reprimand you became involved and there had to be a selection

13    of a hearing officer; is that correct?

14    A.   Yes.

15    Q.   And the hearing officer is the -- at some point was

16    appointed?

17    A.   That's correct.

18    Q.   Right.

19        Now, did the hearing officer meet with Mr. Bahar to get his

20    side of the story, whatever he was being accused of?

21    A.   I wouldn't know that, sir.  I wouldn't know.

22    Q.   Should he have?

23    A.   No.  Normally that is not part of the process of the

24    corrective action process for the City.  You don't meet with

25    the employee.

1   Q.  You don't meet with the person who is accused of doing

2   something un -- you just meet with the accuser?

3   A.  That's correct.

4   Q.  Not much of a hearing; right?

5   A.  It's technically not a hearing until you call -- schedule a

6   meeting and you bring it in, bring the person in.  So it's

7   not --

8   Q.  There was no hearing in this case that Mr. Bahar was

9   allowed to participate in?

10  A.  That's correct.  There was no hearing.

11  Q.  Do you know whether or not as part of this hearing they

12  talked to Mr. Quinn who had allegedly given the verbal

13  approval?

14  A.  I don't know that.

15  Q.  Do you know whether or not they talked -- the hearing

16  person talked to Mr. Bahar's immediate boss, Mr. Huang?

17  A.  I don't.  I assume so, but I don't know for a fact who he

18  spoke to.

19  Q.  Should he have?

20  A.  A hearing officer looking at the information would talk to

21  the supervisor, yes.

22  Q.  All right.  As a matter of fact, when Mr. Campbell or his

23  boss, Mr. Karney, came to you about this matter, they didn't

24  even know how the hearing officer process worked; is that

25  correct?

1    A.  That is correct.

2    Q.  And this was a year or a year-and-a-half after they had

3    started?  Right?

4    A.  Yes.

5    Q.  So it sounds like this was the first or one of their few

6    disciplinary actions of this nature that they had yet taken in

7    their tenure with the City of Cincinnati because they didn't

8    know the process?

9    A.  Yes.

10   Q.  They came to you for advice?

11   A.  I would say -- not advice.  To explain the process.

12   Q.  Right.

13   A.  The City's process.

14       As part of the administrative scope is that managers come

15   to us to understand what the process is, who to contact, and

16   that kind of things.  It's within our, the City's, policies and

17   procedures.

18   Q.  They don't come to see you if they already understand the

19   process?

20   A.  That is correct.  They just execute the process.

21   Q.  Right.  Okay.

22       As a matter of fact, you don't know whether or not the

23   hearing officer talked to Mr. Huang or not, but, in fact, you

24   talked to Mr. Huang as part of this process?

25   A.  Mr. Huang came to me.

1   Q.  Right.

2   A.  Yes.

3   Q.  What was the reason Mr. Huang came to you?

4   A.  Mr. Huang was concerned about issuing the reprimand.

5   Q.  Okay.

6   A.  And part of that discussion was the process but him

7   articulating his concern for writing it.

8   Q.  Why was he concerned that this written reprimand process

9   was being implemented?

10   A.  I think it was from the standpoint of Mr. Bahar being an

11   excellent employee and the ratings as you've just gone through

12   and the desire not to do anything that would affect that

13   record.

14   Q.  Okay.  Did Mr. Huang, who was his immediate boss; right?

15   A.  That's correct.  He was the superintendent of the division.

16   Q.  The superintendent of the division came to you and said I

17   know Mr. Campbell is recommending that we reprimand Mr. Bahar

18   and I as his immediate supervisor, superintendent of the

19   division, think it's inappropriate to do so?

20   A.  The discussion at the time was around disciplining

21   Mr. Bahar.

22   Q.  Yes.

23   A.  The actual outcome of that disciplinary process was the

24   recommendation of the hearing officer.  So there was not a

25   discussion of should we give him the reprimand.  It was more

1    initiating the disciplinary process and that concern.

2    Q.  As a matter of fact, what Mr. Huang wanted to do was

3    resolve the matter outside of this formal process involving a

4    written reprimand; isn't that correct?

5    A.  He expressed his concern for initiating the process.

6    Q.  Right.

7    A.  He did not tell me how he wished to handle it, no, or how

8    he desired to handle it.

9    Q.  There was at least an unofficial step that could have been

10   taken which could have been an oral warning of some sort?

11   A.  That is correct.

12   Q.  Did you think -- did you understand from Mr. Huang that he

13   thought that Mr. Bahar should be warned at all?

14   A.  The conversation was based on him being an excellent

15   employee.

16   Q.  So he didn't --

17   A.  And desired -- as I said, the desire not wanting to do

18   discipline.

19   Q.  He didn't believe that disciplinary action was warranted at

20   all?

21   A.  And I --

22   Q.  Mr. Huang?

23   A.  Yes.  I think that was true.

24   Q.  And so did you -- I suppose you then notified the hearing

25   officer that Mr. Huang, the immediate supervisor, opposed the

1    recommendation?

2    A.   No.  I had no contact with the hearing officer.  That is

3    not the process.

4    Q.   Did you pass the information on to anyone?

5    A.   No.  The actual hearing officer was recommended, and that,

6    of course, the City of Cincinnati is the one that officially

7    assigns the person to the case.  And so that was done.  But

8    then beyond that point, that person does not discuss anything

9    with the administration wing.  We are not a part of it.

10   Q.   Now, how did this come into the disciplinary process in the

11   first place?  Did Mr. Campbell go someplace else first?

12   A.   It's my understanding that the facts of the case were sent

13   to our legal department and at the -- part of that report came

14   back and suggested to the agency the possibility of pursuing

15   discipline.

16   Q.   Now, does every potential -- you know, when somebody does

17   something wrong work performancewise, does HR always send it to

18   the legal department for a review?

19   A.   This wasn't HR.  This is a department.  So the -- yes, the

20   department director can and has on other occasions had the law

21   department or the office of municipal investigations to review

22   documents and recommend to us how to proceed.  So, yes, it's

23   not out of the ordinary.

24   Q.   Well, it may have occurred on occasion, but normally when

25   people perform unsatisfactorily, right, the normal thing is not

1    to go to a law department, right; the normal thing is to go

2    through the disciplinary channels?

3    A.  It depends on the nature of what the employee has done.

4    Q.  Okay.  And in this case when it goes to the law department,

5    there is a suggestion, suggestion, that there is a potential

6    for some sort of criminal activity?

7            MR. NESTOR:  Objection.  I don't know that she has

8    firsthand knowledge of that.

9            THE COURT:  You may answer if you have direct

10   knowledge of that.

11           THE WITNESS:  No, sir, I don't have direct knowledge.

12   Q.  Okay.  What types of cases are referred to the law

13   department prior to the disciplinary process?

14   A.  As a hearing officer, I'll speak to you also as MSD.  If

15   you have a person that a concealed weapon brought on

16   property --

17   Q.  Okay.  Concealed weapon.  That would be criminal activity.

18   A.  -- okay --

19   Q.  Okay.

20   A.  -- the review of that, if there is some thought that there

21   is another violation of law or procedures that are severe --

22   Q.  Severe violation of law.

23   A.  -- that goes to the law department, OMI.  But usually it is

24   things that are beyond the violation of the City of

25   Cincinnati's human resource policies and procedures.

1   Q.   Okay.  Right.  Something beyond just simple a violation of

2   some kind of policy; right?

3   A.   Yes.

4   Q.   I think the first thing you said or the first thing you

5   said was a concealed weapon example.

6   A.   Yes.

7   Q.   Then you said some severe violation of law; right?

8   A.   Yes.

9   Q.   What would -- did Mr. Campbell reveal to you why he wanted

10  the law department to look at whether or not Mr. Bahar had

11  gotten authorization for this particular work order change?

12  A.   No, he did not reveal that to me.

13  Q.   Did you get -- did he give you any facts which led you to

14  believe that Mr. Bahar might have been concealing a weapon or

15  might have engaged in some serious violation of law?

16  A.   He did not reveal that to me, no.

17  Q.   Okay.  That's not a good thing to happen to an employee,

18  right, to know that they're being investigated by the law

19  department?  Not something you want to have happen to you?

20  A.   I -- I guess not.

21  Q.   You know how people are, they kind of sometimes they think

22  if you've been accused of a crime, you're guilty of it; right?

23  A.   Part of the reason why we are sending it to the law

24  department is to protect the employee to make sure that they

25  are not wrongfully being accused for something.

1    Q.   One reason you send it to the law department is to protect

2    the employee?

3    A.   Yeah.   Part of the evaluation is that they're ruling as to

4    has a law been broken or not.   Short of that, you would be

5    acting and possibly taking an action that was unwarranted.

6    Q.   Other than Mr. Bahar, has Mr. Campbell ever come to you and

7    recommended that the law department look at some other

8    employee's actions, another employee other than Mr. Bahar?

9    A.   No.

10   Q.   Has Mr. Karney ever done that?

11   A.   No.   Usually discipline is done in the divisions.

12   Q.   Right.   So in the history of Mr. Campbell and Mr. Karney

13   working in this division, Mr. Bahar who was accused of not

14   getting written authorization for something, he's the only

15   employee you know of that was sent up to the law department for

16   an investigate -- for a look-see to see whether he had engaged

17   in a serious violation of law or some other activity?

18   A.   That I'm aware of, yes.

19   Q.   Okay.   As a matter of fact, the City Solicitor's office

20   sent it back pretty quickly, didn't they?

21   A.   I wouldn't know how quickly they returned it.

22   Q.   They referred it back and said there's no violation of law

23   here?

24   A.   Yes.   That's the report.

25   Q.   As a matter of fact, when the hearing -- then it went to

1  the hearing officer or something eventually; right?

2  A.  Yes.

3  Q.  And while the hearing officer was looking at it, Mr. Bahar

4  was not even notified that the hearing officer was looking at

5  it?

6  A.  I wouldn't know that.  That would have been either

7  Mr. Huang letting him know what actions are going on, the

8  superintendent of the area.  I would not be aware of the

9  communique that's with Mr. Bahar.

10  Q.  Now, you also know that after he was written up with his

11  reprimand, as a matter of fact, the hearing officer or

12  Mr. Campbell or somebody made Mr. Huang actually issue the

13  reprimand; right?

14  A.  I'm aware of the reprimand being issued --

15  Q.  Okay.

16  A.  -- and then it being submitted to the administrative

17  division for processing through the City system.

18  Q.  Okay.  You don't know who had to sign off on it?

19  A.  Yes.  It's the bottom of the form, it usually is the

20  supervisor.

21  Q.  Right.  This was the guy.

22  A.  The person that wrote it and also the employee and the

23  date.

24  Q.  Right.  In this particular case it was the direct

25  supervisor who did not believe discipline was warranted that

1    had to sign off on the discipline?

2    A.   That's correct.

3    Q.   All right.  Mr. Campbell didn't sign off on it?

4    A.   No.

5    Q.   Okay.  And after that, Mr. Bahar made a complaint to HR

6    that he thought that Mr. Campbell was possibly discriminating

7    against him on the basis of his national origin; right?

8              MR. NESTOR:  Objection.  That assumes facts not in

9    evidence.

10             THE COURT:  Sustained at this point.

11   Q.   Okay.  Did Mr. Bahar later make a complaint to HR

12   concerning Mr. Campbell?

13   A.   I think there was some discussions with my HR manager at

14   the time --

15   Q.   Okay.

16   A.   -- that there was not an official complaint lodged with

17   MSD's HR section.

18   Q.   Okay.  And so you think that Mr. Bahar came to one of your

19   colleagues in HR?

20   A.   It may be that he did discuss that, I think, with our HR

21   person.

22   Q.   Which colleague do you think that is?

23   A.   My HR manager who has now retired is Linda Chandler.

24   Q.   I'm sorry?

25   A.   Was Linda Chandler.

1    Q.   Linda Chandler?

2    A.   Yes.

3    Q.   Okay.  And you think that Mr. Bahar might have come to

4    Miss Chandler with a complaint about Mr. Campbell?

5    A.   That the concern -- your point was the concern after the

6    issuing of the discipline.

7    Q.   Right.

8    A.   And I said yes, I thought maybe that might have occurred.

9    Q.   Okay.  And then how about Dave Chapman?  Did Dave Chapman

10   work for you?

11   A.   No.  Dave Chapman was the City of Cincinnati's EEO

12   officer --

13   Q.   Oh.

14   A.   -- for the entire city.

15   Q.   All right.  The head, head cheese with respect to EEO?

16   A.   He's in charge of EEO.

17   Q.   All right.  And did somebody named -- and I'm going to

18   butcher her name -- Rhodia Farria?

19   A.   Farria.

20   Q.   Where did Rhodia Farria work?

21   A.   She worked for Mr. Chapman.

22   Q.   In the EEO office?

23   A.   In the City of Cincinnati's EEO office, yes.

24   Q.   EEO stands for Equal Employment Opportunity?

25   A.   That's correct.

1    Q.   And if an employee has a complaint that they're being

2    discriminated against on the basis of their national origin or

3    otherwise, is the EEO office the right place to go?

4    A.   That is the right place to go.

5    Q.   Could you look, please, at Plaintiff's Exhibit Number 6?

6    A.   Okay.

7    Q.   Does this appear to be a e-mail first from Ali Bahar and

8    secondly from Mr. Chapman?  We have a string of e-mail here,

9    two e-mails.

10   A.   That's correct.

11   Q.   And it looks like on July 25th of 2000, about 15 days after

12   he was reprimanded, Mr. Bahar sent an e-mail alleging that

13   Mr. Campbell may have discriminated against him?

14   A.   Yes.

15   Q.   And two days -- on July 25th, the same day, Mr. Bahar was

16   advised by Mr. Farria that he should schedule an appointment --

17   I'm sorry, yeah, that he was advised by Mr. Chapman that he

18   should contact Rhodia Farria?

19   A.   That's correct.

20   Q.   Okay.  On July 25th.

21   A.   Yes.

22   Q.   All right.  And is the City of Cincinnati EEO office when

23   they receive a complaint of that nature, are they supposed to

24   investigate it?

25   A.   Yes.

1    Q.   Okay.  In a particular instance like this where someone

2    like Mr. Bahar is accusing Mr. Campbell of discriminating

3    against him, would be -- one step would be to meet with

4    Mr. Bahar, I suppose?

5    A.   Mr. Chapman, you mean?

6    Q.   No.  I mean somebody from the EEO office would sit down and

7    talk to Mr. Bahar and find out what his complaint was?

8    A.   Yes.  And that's probably the scheduling of the

9    appointment.

10   Q.   And once that's done, I think he came in on July 27th, is

11   the next step in the EEO process to get the other side of the

12   story?

13   A.   I would assume so.  I cannot speak to Mr. Chapman's

14   process.  He had a team of investigators.

15   Q.   EEO was somewhere under your umbrella; right?

16   A.   I have -- there is an EEO representative that works for me

17   within the department.

18   Q.   Okay.

19   A.   And then Mr. Chapman is the City's EEO officer.

20   Q.   And would one step in the process be notifying the person

21   who was the object of the complaint that a complaint's been

22   lodged against them?

23   A.   Mr. Chapman's process is an objective process.  Usually

24   employees pursue that when they want -- they would not go to my

25   HR person -- or, sorry, EEO person simply because it's a

1    more -- they figure they get a more objective assessment of the

2    process and it's not an MSD employee.

3    Q.   Well, let's just hold it to what you know about this EEO

4    person that worked directly for you?

5    A.   Yes, he does.   MSD.   MSD EEO person, yes.

6    Q.   What's his name?

7    A.   His name is Wendell Young.

8    Q.   Wendell Young.

9        When he receives a possible complaint of discrimination,

10   does he notify the person who's been accused of discrimination?

11   A.   Usually the employee touches base with him --

12   Q.   Right.

13   A.   -- and has a concern.

14   Q.   Employee notifies Wendell Young I have a complaint of

15   possible discrimination.

16   A.   Yes.

17   Q.   Wendell Young sits down with the employee, finds out one

18   side of the story?

19   A.   That's correct.

20   Q.   Does Mr. Young then in the normal course of things notify

21   the person who is accused of doing the discrimination?

22   A.   As part -- yes, part of that investigation process is to

23   talk and go see, yes.   In that area, I'm sorry.

24   Q.   And that would be they're supposed to do that promptly?

25   A.   Yes.

1    Q.   Okay.  Do you have any rule of thumb on how promptly they

2    ought to start investigation of that nature?

3    A.   I can only speak to MSD's process, not Mr. Chapman's.  With

4    our process, when the employee meets with Mr. Young, the

5    expectation is that he will immediately look into the matter.

6    Q.   Okay.

7    A.   Investigate the matter.

8    Q.   And immediately would mean within a day, two days, three

9    days, four days, five days, but pretty quick?

10   A.   Yes.

11   Q.   And sometimes the notifications to the person who is

12   accused is simply advise before they sit down, you know, so and

13   so, I want to inform you that Mr. Bahar has filed a complaint

14   against you and we need to meet sometime in the future?

15   A.   Yes.  That's correct.

16   Q.   Okay.  In other words, the person might be notified of the

17   complaint before they're really asked to officially respond?

18   A.   That's correct.

19   Q.   Might be given a heads-up?

20   A.   Part of the investigation is to do the fact finding and

21   find out the nature of the complaint.

22   Q.   Particularly somebody like Mr. Campbell, you might give him

23   a heads-up, hey, somebody has accused you of discrimination and

24   we need to look into this soon?

25   A.   That's not how we handle it.  The reason for the EEO

1    officer is so that the employee feels like he or she can go and

2    talk concerning the issue, and it's confidential most of the

3    time in terms of the nature of it.  And how it's investigated

4    is not giving top management notification there is a charge as

5    much as fact finding trying to find out those things.  So if

6    part of that charge is that the director or deputy is being

7    charged, then he is going to meet with one of them in that

8    investigative process.  If they are not a part of it, he is not

9    going to then call them and say guess what, we have this

10    charge.  It's very --

11           THE COURT:  Mr. Freking, do you anticipate concluding

12    your cross within the next ten minutes?  And don't read that to

13    mean I'm forcing you; I'm not.  If you've got longer than that,

14    I'm going to adjourn at that point.

15           MR. FREKING:  I probably have slightly -- not much

16    longer but probably long enough that we could adjourn to

17    tomorrow.

18           THE COURT:  Why don't we do that.  And we'll return

19    tomorrow morning.  I'll keep my word to the jurors.

20           MR. FREKING:  That sounds like a good idea.

21           THE COURT:  Miss Johnson, you may step down for now.

22    You'll be back tomorrow at nine a.m.  All right?

23           THE WITNESS:  All right.

24           THE COURT:  Thank you.

25           We will adjourn for the evening.  Please close your

1    books.  Don't discuss the case.  Don't allow anyone to discuss

2    it with you or in your presence.

3            Does anyone anticipate any problem arriving here

4    slightly before nine so that we can begin at nine tomorrow

5    morning?

6            Okay.  Very well.  Then have a pleasant evening.

7            The Court will adjourn until 9 o'clock tomorrow

8    morning.  Thank you.

9        (Jury out at 4:35 p.m.)

10            THE COURT:  See you in the morning, folks.

11        (Proceedings adjourned at 4:36 p.m.)

12                            - - -

13

14

15

16

17

18                    C E R T I F I C A T E

19            I, Julie A. Wolfer, the undersigned, do hereby

20    certify that the foregoing is a correct transcript

21    from the record of the proceedings in the above-entitled

22    matter.

23                        s/Julie A. Wolfer
                          _____
                          Julie A. Wolfer, RDR, CRR
24                        Official Reporter

25

1                                    INDEX

2
                                Direct    Cross    Redirect    Recross
3    PLAINTIFF'S WITNESSES:

4    JULIA JOHNSON
        (by Mr. Freking)                    2
5

6

7
     EXHIBITS                                              ADMITTED
8
     Plaintiff's Exhibit 2-1                                 13
9    Plaintiff's Exhibit 2, 2-1 through 2-24                 15

10
                                  - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25