1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4                   - - -

5   ALI BAHAR,                    :   CIVIL NO. 1:01CV798

6           Plaintiff,            :   (Consolidated with
                                      CIVIL NO. 1:02CV697)
7      -vs-                       :
                                      Second Day of Jury Trial
8   CITY OF CINCINNATI,           :
                                      Thursday, January 20, 2005
9           Defendant.            :   Covington, Kentucky

10                  - - -

11          EXCERPT OF TRIAL PROCEEDINGS
          CONTINUED TESTIMONY OF JULIA JOHNSON
12   BEFORE THE HONORABLE MICHAEL H. WATSON, JUDGE
                   AND JURY

13                  - - -

14

15   For the Plaintiff:   Randolph H. Freking, Esq.
                          Kelly Mulloy Myers, Esq.
16                        Freking & Betz
                          215 East Ninth Street, Fifth Floor
17                        Cincinnati, Ohio  45202

18   For the Defendant:   Augustine Giglio, Esq.
                          Terrance A. Nestor, Esq.
19                        Assistant City Solicitors
                          Room 214, City Hall
20                        801 Plum Street
                          Cincinnati, Ohio  45202

21

22   Law Clerk:           Dorothy Gass

23   Courtroom Deputy:    Barbara Crum

24

25   Court Reporter:      Julie A. Wolfer, RDR, CRR

                          - - -

              Proceedings recorded in stenotype.
       Transcript produced using computer-aided transcription.

1                          PROCEEDINGS

2                              * * *

3          THE COURT:  Good morning, Miss Johnson.

4          THE WITNESS:  Good morning, sir.

5          THE COURT:  You're still under oath, ma'am.

6          Mr. Freking, you may proceed.

7          MR. FREKING:  Thank you, Judge.

8                          JULIA JOHNSON

9                  CROSS-EXAMINATION (Continued)

10   BY MR. FREKING:

11   Q.   Good morning, Miss Johnson.

12   A.   Good morning.

13   Q.   Yesterday we covered Mr. Bahar's career up until about

14   August of 2000 to some extent with you.  I don't want to rehash

15   that at all.  I think we got to the point where he was being

16   reclassified from his EIT to a CET-4.  Do you recall that?

17   A.   Yes, I do.

18   Q.   And you talked about application of the ten-year rule if

19   there is a need in a particular area?

20   A.   That's correct.

21   Q.   All right.  Could you please turn in the exhibit book you

22   were looking at yesterday to Plaintiff's Exhibit Number 7?

23   A.   Okay.

24   Q.   Do you see that document?

25   A.   Yes, I do.

1    Q.   This appears to be a memo from you on August 18th of 2000

2    changing certain employees who were EITs to other

3    classifications; is that correct?

4    A.   That's correct.

5    Q.   All right.

6         MR. FREKING:  We'd move for the admission of

7    Plaintiff's Exhibit 7.

8         THE COURT:  Any objection?

9         MR. NESTOR:  No, sir.

10        THE COURT:  So admitted.

11   Q.   All right.  Miss Johnson, I'd like to direct your attention

12   to the middle of that page, and I think we had testimony

13   yesterday from you that Mr. Bahar was transferred shortly after

14   that memo to wastewater collection.  Do you remember that?

15   A.   That is correct.

16   Q.   Okay.  Was there room for Mr. Bahar in wastewater

17   collection at that time, do you know?

18   A.   There -- yes, there was room for him.

19   Q.   Did they have space problems in the physical location for

20   wastewater collection in order to find him a desk and a chair?

21   A.   Okay.  I'm sorry, when you said "room," I was talking in

22   terms of position availability --

23   Q.   Right.

24   A.   -- in terms of him transferring.

25        In terms of space, as the administrative superintendent I

```
 1   would not know that.
 2   Q.   Who made the decision to move him to wastewater collection?
 3   A.   That was the director --
 4   Q.   Mr. Campbell?
 5   A.   -- and the superintendent.  That would have been
 6   Mr. Karney --
 7   Q.   Mr. Karney?
 8   A.   -- and the superintendent at the time.  I mean, the
 9   superintendent, Mr. Minges, based on the needs of that
10   organization.
11   Q.   Now, there were other EITs in wastewater engineering also
12   like Mr. Bahar; right?
13   A.   That is correct.
14   Q.   Ms. Schmidt, Penny Schmidt, was she moved outside of
15   wastewater engineering to another area like wastewater
16   collection?
17   A.   No.  She was moved within the division from one program to
18   another program --
19   Q.   She stayed in --
20   A.   -- after the implementation of this.
21   Q.   She stayed in engineering?
22   A.   That is correct.
23   Q.   All right.  How about Cassandra Hillary?
24   A.   She stayed within.
25   Q.   How about Quinones was also in engineering?
```

JOHNSON - CROSS

1    A.   Yes, from program to program within the division.

2    Q.   Stayed in engineering?

3    A.   Yes.

4    Q.   Do you know why it was that Mr. Bahar -- I think you agree

5    with me he was recognized as a very good employee within

6    wastewater engineering?

7    A.   A good employee within the department, both treatment and

8    engineering.

9    Q.   Right.  And he had been in engineering since mid -- early

10   to mid '90s; right?

11   A.   I think Mr. Bahar became a part of the engineering division

12   when there was a merger of the planning and program management

13   division which was 1999.  So prior to that he was in another

14   division program.

15   Q.   And do you know how it was that Mr. Bahar was the one who

16   was moved to wastewater collection as opposed to Ms. Schmidt,

17   Ms. Hillary, Mr. Quinones?

18   A.   I would think that based on Mr. Bahar's background,

19   mechanical and civil, that part of that was, as the memo has

20   indicated, that we would be moving them and placing them

21   according to their engineering special expertise or where their

22   studies were.  So based on that, that's what my assumption is

23   is why Mr. Bahar was selected.

24   Q.   Did anybody tell you why he was selected rather than the

25   others?

1    A.  No more than I think based on need, yes.

2    Q.  All right.  And you think he had some kind of background

3    and experience for collection?

4    A.  His background, his mechanical, yes.

5    Q.  All right.  Thank you.

6         And then did you find out -- did you find out later that

7    there were space problems within collection?

8    A.  No, I did not.

9    Q.  Could you turn in the other book, the larger book, to

10   defendant's exhibit which has got the City of Cincinnati emblem

11   on it, I think.  Okay.  You got that book?

12   A.  Yes, I do.

13   Q.  Could you look at Defendant's Exhibit 2023, please?

14   A.  Yes.

15   Q.  All right.  We talked yesterday --

16         MR. FREKING:  Oh, I'm sorry.  We'd move for admission

17   of Defendant's Exhibit 2023.

18   A.  I'm sorry, 2023?

19         MR. NESTOR:  No objection.

20         THE COURT:  So admitted.  Thank you.

21         Do you have it, ma'am?

22         THE WITNESS:  No, not yet, sir.

23         THE COURT:  All right.

24         THE WITNESS:  Yes.

25   Q.  Okay.  Now, Mr. Bahar reached the ten-year mark in 1998 as

1   an EIT; correct?

2   A.   Yes.

3   Q.   This is a November 2, 1999 memo, is it not?

4   A.   Yes, it is.

5   Q.   From Mr. Karney?

6   A.   Yes.

7   Q.   Campbell's boss?

8   A.   Yes.

9   Q.   Concerning working employees out of classification?

10  A.   That's correct.

11  Q.   Did this include working people out of classification

12  beyond the ten-year rule?  Did the ten-year rule apply to this

13  memo at all?

14  A.   No, it did not.

15  Q.   So this has nothing to do with the ten-year rule?

16  A.   This policy is preventing managers to take an employee in

17  one class and work them in classes higher than what they were

18  hired to be.

19  Q.   Okay.  Because MSD had recently come under scrutiny for

20  allegedly working persons outside of their classifications; is

21  that correct?

22  A.   No.  The onus of this policy was on the basis of an

23  employee who felt they were worked out of class, and then, of

24  course, part of that was a study by the City HR department and

25  also working with the law department on this particular issue.

1    And the end result of that was a policy recommendation to

2    Mr. Karney that we put this policy in place.  It clarifies and

3    prevents the employee from being worked out of class and a

4    penalty if that's so done.

5    Q.   Had there been a rule previously not to do that?

6    A.   There is a City rule, but this implement -- this policy was

7    more implemented in the department or reinforced in the

8    department.  Yes, there is a City policy.

9    Q.   Was there anyone disciplined for violating that policy

10   prior to November 2, 1999?

11   A.   No.  The purpose of this policy and the recommendation of

12   the law department was to not do discipline at the time but to

13   put a policy in place and educate the workplace on the

14   inappropriate actions of working people out of class.

15   Q.   So even though people had been worked out of class, the

16   recommendation was let's not discipline any of the managers

17   involved; is that correct?

18   A.   I wouldn't state it that way.  I would say that if

19   supervisors were and we were not aware of them doing so, this

20   letter tells them they're not permitted to do so and if they

21   do, what would occur.

22   Q.   All right.  You're saying -- the first sentence, it says:

23   "MSD has recently come under scrutiny for allegedly working

24   persons out of classification."

25   A.   That was an employee who filed a grievance, a union

1    employee who alleged that he was worked out of class which

2    brought forth the end result of this, this policy.

3    Q.   Very good.   Thank you very much.

4              MR. FREKING:   No further questions, Your Honor.

5              THE COURT:   Thank you, Mr. Freking.

6              Ladies and gentlemen, ordinarily we would wait to

7    conduct the direct of Miss Johnson until the defense's case,

8    but by agreement of counsel they will conduct her direct

9    examination now.   She has been on cross-examination.   She will

10   now be on direct.

11             All right.   Mr. Nestor, go right ahead.

12             MR. NESTOR:   Thank you, Judge.

13                        DIRECT EXAMINATION

14   BY MR. NESTOR:

15   Q.   Good morning, Mrs. Johnson.

16   A.   Good morning.

17   Q.   When Mr. Campbell joined the MSD, who was the director?

18   A.   Patrick Karney.

19   Q.   And what were the two positions that Mr. Karney and

20   Mr. Campbell held?

21   A.   Mr. Karney was the director of MSD, and Mr. Campbell was

22   the deputy director of MSD.

23   Q.   And then just for the jury's information, how many

24   divisions and division heads were there at the time?

25   A.   There are six divisions and six division heads.

1    Q.   And you were one of the division heads?

2    A.   Yes, I am.

3    Q.   Did the new administration -- when Mr. Karney and

4    Mr. Campbell began, did they do a reorganization of any of the

5    functions of MSD?

6    A.   No, they did not.

7    Q.   Did there --

8    A.   The divisions remained the same as they were when they

9    joined the organization.

10   Q.   We talked a little bit or you talked a little bit in your

11   examination earlier about the planning and program management

12   division.

13   A.   That was not once they first got there.  After they had

14   been there for a period of time.

15   Q.   All right.

16   A.   Then in '99 they did.

17   Q.   Can you describe for the jury what that division was, the

18   planning and program management?

19   A.   Yes.  The City -- I mean, MSD has a large capital

20   improvement program that is the responsibility of the

21   engineering division now.  Prior to that and their -- there was

22   an establishment of the planning and program management

23   division where the individuals there would work at trying to

24   initiate and get projects done very quickly in terms of

25   improving the sewer system either by upgrading, putting new

1    sewers, but that team was designed and responsible for bringing

2    forth and implementing the CIP in a very efficient and

3    effective manner.

4    Q.   And did there come a time, then, when that department was

5    reorganized within MSD?

6    A.   In '99 it was then merged back under -- it was an

7    independent division and then it was merged back into the

8    engineering division.

9    Q.   And what -- was Mr. Bahar in that division?

10   A.   Yes, he was.

11   Q.   And then that entire division was transferred back to

12   wastewater engineering?

13   A.   That's correct.  It became a part of engineering.

14   Q.   And so was Mr. Bahar affected when that reorganization took

15   place?

16   A.   Yes.  As all members of PPM was.

17   Q.   Once he was in engineering and the written reprimand came

18   about, can you describe what kind of an effect does a written

19   reprimand have on an employee's pay?

20   A.   It has no effect on the employee's pay.

21   Q.   What kind of effect does a written reprimand have on an

22   employee's benefits?

23   A.   It has none.

24   Q.   And a City employee, as we know, that hopefully we are able

25   to get a yearly raise.  What effect does a written reprimand

1    have on an employee's ability to get what is called a step-up?

2    A.   If we were able to get them, none.

3    Q.   And can you tell the jury, do City employees every year get

4    a step-up in pay?

5    A.   The -- if you are currently under the climate now, if

6    you're a member of the AFSCME union, a negotiated effort, you

7    do.   Management right now there are no merit increases per the

8    city manager's edict.

9    Q.   Would a written reprimand have any effect on his promotion

10   eligibility?

11   A.   No.

12   Q.   All right.   If you could go ahead and turn to the

13   Defendant's Exhibit 2000 -- 2002 which I believe was previously

14   admitted as Plaintiff's Exhibit 7, it's the memo of August

15   18th, 2000.

16   A.   Yes.

17   Q.   All right.   And I just want to go through the individuals

18   that were affected.

19        First of all, as to -- and I'm going to use the defendant's

20   exhibit because that's the one I have, but this was already

21   marked for you.   What is the date on the memo?

22   A.   Date on the memo is August 18th.

23   Q.   2000; correct?

24   A.   2000, yes.

25   Q.   And were you directed to issue that memo by Mr. Campbell?

1    A.   Several months prior to that -- remember I mentioned

2    yesterday the need was to bring in engineering expertise, and

3    several months prior to this it was my staff, Mr. Karney

4    directing my staff to begin to research on how we might be able

5    to do that.   And part of that review is looking to see the

6    EITs, are they close to getting the P.E. license, professional

7    license; if not, where are there engineering vacancies.

8         This was an attempt not to increase, we could not add

9    additional positions to the organization, as much as try to

10   fill the existing things we have.   So that's several months ago

11   prior to this Mr. Karney did have myself and staff looking at

12   this.

13   Q.   And if it was Mr. Karney, who on your staff went about

14   determining who this rule applied to?

15   A.   This is the HR staff.   Linda Chandler who is my HR manager

16   and staff at the time.

17   Q.   And it was -- is it fair to describe it as a process where

18   they determined who this rule would apply to?

19   A.   That's correct.

20   Q.   The individuals that are listed, if we could just -- well,

21   first of all, does the MSD, do they maintain a list of where

22   their employees are from originally or where -- what the

23   national origin of their background is?

24   A.   No.   That information is actually maintained with the

25   City's HR office.

```
 1   Q.  So the -- you're -- your function in HR for MSD, you don't
 2   have a list of, for example, who is foreign born in the
 3   department?
 4   A.  No, we did not.
 5   Q.  The individuals that are listed, do you know, though, if
 6   they are Caucasian or from some other ethnicity?
 7   A.  Only in the sense that they would if a report would come to
 8   us, but, no, I do not have any way of looking at something
 9   saying that unless they have declared it.
10   Q.  Well, for example, in this case we know Mr. Bahar's
11   background because of this case; correct?
12   A.  That is correct.
13   Q.  The other people who were EITs, were any of them to your
14   knowledge of a different ethnic background?
15   A.  I -- I would say just based on the name, based on name I
16   would say Mr. Saeed is.
17   Q.  And is there anyone else who is from a different ethnicity
18   that you know of personally?
19   A.  Miss -- Mr. Efrain, I think.
20   Q.  That's Mr. Quinones?
21   A.  Quinones, yes.
22   Q.  And was he also reclassified?
23   A.  Yes.
24   Q.  And was Mr. Saeed also reclassified?
25   A.  Yes.
```

1  Q.  And the remainder of those people were Caucasian; is that

2  correct?

3  A.  Yes.

4  Q.  And they were all reclassified?

5  A.  Yes.

6  Q.  All right.  Turning back to the exhibit that was just

7  discussed by Mr. Freking, if you could turn to Defendant's

8  Exhibit 2023.  First of all, what's the date on that memo?

9  A.  The date on the policy is November 2nd, 1999.

10  Q.  And if, for example, the City was working individual

11  employees outside their class, what was this policy designed to

12  prevent?

13  A.  It was designed to prevent them from being worked out of

14  class so that they would be properly performing the job.

15  Q.  All right.  Who issued the memorandum?

16  A.  It was issued by the director.

17  Q.  And would you have received the memorandum?

18  A.  Yes.  As a matter of fact, we would have drafted the

19  policy.

20  Q.  And then at the bottom there is a cc to the management team

21  of MSD?

22  A.  Yes.

23  Q.  Would that have included yourself?

24  A.  Myself and all superintendents, yes.

25  Q.  Do you know citywide if there was a concern with working

1    individuals outside of their classification?

2    A.  As a part of the City's policies, personnel policies and

3    procedures, there is in the classification series it speaks to

4    not working people out of class.  So there is a policy citywide

5    that governs this.

6    Q.  And in particular, if you could turn to Defendant's Exhibit

7    2022.

8    A.  Yes.

9    Q.  Can you identify that document?

10   A.  Yes.  That is a document from the city manager entitled

11   "Working Employees Out of Classification."

12            MR. NESTOR:  The defendants would move for the

13   admission of Defendant's Exhibit 2022.

14            MR. FREKING:  No objection.

15            THE COURT:  So admitted. Thank you.

16   Q.  What is the -- I'm sorry, what is the date of that memo?

17   A.  The date of this memo is June 5th, 2000.

18   Q.  And just for the jury's benefit, who is that from and who

19   would that memo go to?

20   A.  It is from the city manager, John Shirey, and it is to the

21   director -- I'm sorry, the department and division heads.  So

22   it would go to the directors and division heads in the

23   departments.

24   Q.  And we know that there is a director who is the head of

25   MSD.  What function does the city manager serve in the City of

1    Cincinnati?

2    A.  He is the director's boss.

3    Q.  All right.  And other than city council, is there anyone

4    above the city manager?

5    A.  No.

6    Q.  All right.  And what from your review of the memorandum,

7    what does that order the department heads or direct the

8    department heads?

9    A.  It, too, is ordering not working employees out of

10   classification.

11   Q.  And if you could, turn to Defendant's Exhibit 2003.

12       Can you identify that document for the record?

13   A.  Yes.  It's a classification specification for

14   engineer-in-training position.

15           MR. NESTOR:  Defense would move the admission of

16   Defendant's Exhibit 2003.

17           MR. FREKING:  No objection.

18           THE COURT:  Admitted.  Thank you.

19   Q.  Ma'am, if you could turn to page two of that

20   classification, does this classification list the educational

21   requirements for the EIT position?

22   A.  Yes, it does.

23   Q.  And does it also contain the ten-year rule?

24   A.  Yes, it does.

25   Q.  And when you review that classification specification, can

1  you tell when that classification specification was first

2  implemented and then revised?

3  A.  Yes.  It was first implemented 1 of '86, revised 10/87, and

4  then again 9/93.

5  Q.  Do you recall discussing with Mr. Karney why there needed

6  to be more senior engineers within the division?

7  A.  It would not be me discussing why there would need to be

8  more.  It would be Mr. Karney saying there is a need to have

9  engineers and a directive or an assignment to go about finding

10 how we could hire those engineers.

11 Q.  Did anyone from MSD, whether it be Mr. Karney or

12 Mr. Campbell, ever indicate to you that the reclassification

13 was directed at Mr. Bahar as opposed to all of the individuals

14 who were in the EIT classification?

15 A.  No, he did not direct it to any one individual.

16 Q.  Once the reclassification memo was redistributed, what

17 was -- distributed to the employees and the division people,

18 what was the process for those employees in terms of their

19 reclassification?

20 A.  First, Mr. Karney had asked that myself and Linda Chandler

21 meet with all of the affected employees to discuss with them

22 that the reclassification was going to occur and the reason

23 why, and that was predating the official approval by the Civil

24 Service Commission so they would be aware.

25 Q.  So the Civil Service Commission is an independent body

1    within the City, is that --

2    A.    That is the governing body that approves all actions for

3    hiring and the classifications for the City.

4    Q.    And if there is to be a change in classification, does it

5    require a Civil Service approval?

6    A.    Yes.

7    Q.    And in this particular circumstance was this change in

8    classification approved?

9    A.    Yes.

10   Q.    Within the Civil Service system, does a person have a right

11   to appeal --

12   A.    Yes.

13   Q.    -- any kind of job change like that if you're protected by

14   Civil Service?

15   A.    Yes, they do.

16   Q.    And were these individuals protected by the Civil Service?

17   A.    Yes, they were.

18   Q.    Did anyone appeal the reclassification?

19   A.    Mr. Bahar did appeal.

20   Q.    And what's your understanding of the outcome of the appeal

21   in the Civil Service Commission?

22   A.    My understanding of the outcome was Mr. Bahar appeared

23   before the Commission.  The Commission denied the appeal.  I

24   think at the time Mr. Bahar not only appealed the

25   reclassification but requested a new job title of project

1    manager and that both that was denied.  However, the Commission

2    did tell him that once he received his professional license,

3    MSD would appoint him -- must appoint him as a senior engineer.

4    Q.  And was that, based on your understanding of the EIT

5    classification, is that the normal course for advancement from

6    EIT to an engineering position?

7    A.  That's the normal course.

8    Q.  So whoever is an EIT for this ten-year period, what

9    happened once they get their professional license?

10   A.  They are promoted to senior engineer.

11   Q.  When you issued the memo regarding the reclassification,

12   were you personally aware that Mr. Bahar had filed an internal

13   EEO complaint with the City of Cincinnati's EEO?

14   A.  No.

15   Q.  Do you know when you first became aware that there may have

16   been a -- an internal complaint to the City's EEO?

17   A.  I think there was probably like an FYI that something had

18   happened later but not initially.

19   Q.  Was it after the reclassification memo that you became

20   aware that there was an internal EEO complaint?

21   A.  I cannot recall.

22   Q.  All right.  Did Mr. -- we talked a little bit about your HR

23   versus the City's EEO.  Can you describe the function -- the

24   difference between the functions of an internal EEO person in

25   MSD and the City's EEO?

1  A.  Okay.  Within MSD, as I said yesterday, Mr. Wendell Young

2  is the only person.  There is no staff who an employee of MSD

3  if they have an issue or concern about discrimination or they

4  feel that they are -- there is disparate treatment, any

5  violation of Title VII, they can contact Mr. Young and he will

6  do an internal investigation.

7      If they're not satisfied, they still can go outside and

8  avail themselves to the City resources.  The City's EEO

9  department reports directly to the city manager and, again,

10  investigates issues of Title VII, does have a staff, is

11  accountable to the city manager and the city council around

12  hiring practices, and also to let them know about

13  discrimination cases and the resolutions of those.

14  Q.  Now, in your department if there is -- as to any employee

15  who comes to Mr. Young or whoever the EEO officer is, do you

16  necessarily automatically know that there's been a -- an issue

17  raised by an employee?

18  A.  No.  The nature of my section is it's confidential.  And

19  it's really so that the employee can feel that they can at

20  least have a resource and it's not spread or talked.

21  Q.  As to the City's EEO office function, first of all, I don't

22  know that the jury knows this, but where is the MSD

23  administration physically located?

24  A.  1600 Gest Street.

25  Q.  All right.  And where is the City's EEO office located?

1    A.   It was located in the Centennial Two downtown by City Hall.

2    Q.   At the time?

3    A.   Yes.

4    Q.   And now where is it?

5    A.   It's in the City personnel department.

6    Q.   Which is physically where?

7    A.   It's physically in Centennial Two also on the second floor.

8    Q.   So two -- there's the City -- is it fair to say that that's

9    the City Hall location for city administration functions?

10   A.   That's correct.

11   Q.   And then you're -- the MSD is physically located, the

12   administration is located at the treatment plant on Gest

13   Street; is that --

14   A.   In the Price Hill area.

15   Q.   Just so the jury knows physically where you are.

16        If there is a complaint to the City's internal EEO, are you

17   automatically notified?

18   A.   Are we speaking of MSD or the City?  Or both?

19   Q.   The City.  If there is an internal complaint to the City's

20   EEO, first of all, do you know are you automatically, you

21   personally, are you automatically notified?

22   A.   No.

23   Q.   All right.  And do you know typically how it happens that

24   the department is notified that there is an internal EEO

25   complaint?

1    A.   The contact usually is from the EEO office to the director

2    of the departments.

3    Q.   And then how do you become aware?

4    A.   Only would in a report setting.  Once the investigation has

5    been done and a report is sent from downtown, that information,

6    that report may come to us for records.

7    Q.   So is it fair to say there's typically a period of time

8    between the City's internal EEO investigation and when the

9    department is notified?

10   A.   Yes.

11   Q.   And you don't know specifically when your department was

12   notified of the internal EEO complaint?

13   A.   No, I can't recall.

14   Q.   And that information would typically go to the director?

15   A.   That's correct.

16   Q.   Mr. Young, Wendell Young, he's the internal EEO officer for

17   your department?

18   A.   Yes.

19   Q.   He was at the time?

20   A.   He still is.

21   Q.   All right.  Do you know when he started?

22   A.   He started in 2000.  He came to us from the police

23   department.  He first started working with -- he was the

24   assistant personnel director for the City of Cincinnati.  Then

25   he was moved to the police department as a training coordinator

1    and then came to us in 2000.

2    Q.  All right.  You don't recall in particular the exact date

3    that he started at MSD?

4    A.  Not the exact date.

5    Q.  All right.

6         MR. NESTOR:  Your Honor, if I may approach the witness

7    to refresh her recollection.  I'm just going to show her --

8         THE COURT:  Yes.

9    Q.  And I'm showing you a document.  Without reading the

10   document, does that refresh your recollection as to when

11   Mr. Young would have started at MSD?

12   A.  Yes.

13   Q.  All right.  And what was the date that Mr. Young started at

14   MSD?

15   A.  Effective date was August 19th, 2000.

16   Q.  All right.  Thank you.

17        After the Civil Service appeal, did Mr. Bahar eventually

18   take and pass the exam to get his license?

19   A.  Yes, he did.

20   Q.  And do you recall if you were notified regarding his

21   passing?

22   A.  Yes, I was, by way of an e-mail from the director

23   congratulating Mr. Bahar on passing and directing him to bring

24   his information to me.

25   Q.  If you could, then, turn to Defendant's Exhibit 2098.

1    A.   Could you repeat that again, please?

2    Q.   Defendant's Exhibit 2098.   It should be at the very end.

3         And, if you could, identify that document for the record.

4    A.   It's a series of e-mails.

5    Q.   Okay.

6              MR. NESTOR:   Defendants would move for the admission

7    of Defendant's Exhibit 2098.

8              MR. FREKING:   No objection.

9              THE COURT:   Admitted.   Thank you.

10   Q.   All right.   The original -- I'm going to show you the

11   original message first of all, as these are e-mails.   What was

12   the bottom message on the e-mail?

13   A.   The bottom message is from Mr. Bahar, promotion to senior

14   engineer.   It's to Mr. Campbell.

15   Q.   Does it indicate the date that he was given his license or

16   submitted the information that he had passed his --

17   A.   On January 31st.

18   Q.   And then as the human resource person for MSD, would you

19   then be responsible for his promotion or at least the paperwork

20   regarding the promotion?

21   A.   That's correct.

22   Q.   All right.   And then did you respond -- well, first of all,

23   did you get a copy of that e-mail that was sent to Mr. Campbell

24   from Mr. Bahar?

25   A.   No -- yes, I did.   I'm sorry.

1    Q.   And then you respond and then that's on the top; correct?

2    A.   Yes.

3    Q.   All right.  Does that indicate when you became aware

4    regarding the passage of the exam?

5    A.   Yes.  February 7th, 2002.

6    Q.   And did you indicate to Mr. Bahar what actions you would

7    take?

8    A.   Yes.  I responded to Mr. Bahar's e-mail from home.  I had

9    had eye surgery, and so I responded to let him know when I

10    would be returning so that he would know that we would be

11    taking care of the matter.

12    Q.   Then is there a process that you go through to confirm that

13    he has actually passed the exam?

14    A.   Yes.  Part of the process is that we then touch base with

15    the Boards that where the test was passed.  We also --

16    Mr. Bahar's license, he passed it in Pennsylvania and then he

17    had to get reciprocity in the state of Ohio, and so it was

18    verifying all of those things and then taking that verification

19    and submitting that to the Civil Service Commission.

20    Q.   And then did Mr. Bahar eventually receive his promotion?

21    A.   Yes, he did.

22    Q.   And do you know what the time period was between the

23    February 7th e-mail and when he was officially promoted within

24    the City system?

25    A.   The official Civil Service action was in March after all of

1    the query and input and things.  But the promotion's effective

2    date was retroactive back to February the 2nd -- I'm sorry,

3    February 3rd.

4    Q.   And did he receive a pay raise, to your knowledge,

5    regarding his promotion?

6    A.   Yes, he did.

7    Q.   All right.  When an MSD employee is promoted within the MSD

8    to a position like senior engineer, is there a typical raise

9    for such an employee?

10   A.   Yes.

11   Q.   And is that -- what is the typical raise?

12   A.   It's normally 5 percent.

13   Q.   All right.  Turning to Defense Exhibit 2093, if you could

14   take a look at that document.

15   A.   Yes.

16   Q.   And if you could identify that document for the record.

17   A.   It is a document that was prepared by us that speaks of

18   employees and the percentages that they've gotten at the time

19   of promotions --

20   Q.   Okay.

21   A.   -- between different time periods.

22           MR. NESTOR:  Defendants move the admission of Defense

23   Exhibit 2093.

24           MR. FREKING:  No objection.

25           THE COURT:  Admitted.

1    Q.   This is a two-page document that lists raises for time

2    periods; is that correct?

3    A.   Yes.

4    Q.   And Mr. Bahar is demonstrated there on the first page?

5    A.   Yes.

6    Q.   And what time frame did your office look at to compile the

7    list of promotions on page one?

8    A.   From 1/1/2000, 7/1/2002.  It's 7/1/2002, 1/1/04.

9    Q.   And does that list the employees at MSD that received a

10   promotion from one rank to a different rank?

11   A.   That's correct.

12   Q.   And does it demonstrate the typical amount of -- as a

13   percentage amount of a raise for an MSD employee who receives a

14   promotion?

15   A.   That's correct.

16   Q.   All right.  And does this document comport with your

17   understanding that the typical raise is 5 percent?

18   A.   That is correct.

19   Q.   But some lucky people in fact got more than 5 percent; is

20   that correct?

21   A.   The -- there are some that are showing 10 percent.

22   According to the City's policy, the normal is 5 percent.  An

23   individual can get 10 percent with additional justification by

24   the superintendent of the area to the department director.  But

25   the policy does lend itself that if there are additional

1    expertise, that they want to appeal to get an additional

2    increase.

3    Q.   And some unlucky people get less than 5 percent?

4    A.   It appears that way.  But each classification has a salary

5    range and so, therefore, when the person is advanced up, if it

6    does not lend itself within that range to be 5 percent, that's

7    what you see happening.  It's not that they're just getting --

8    Q.   Okay.  I just wanted to make sure.

9         Have a problem.

10        So Mr. Bahar received a 5 percent?

11   A.   Yes, he did.

12   Q.   And that -- the first page lists all the promotions from

13   January of 2000 through July of 2002?

14   A.   That's correct.

15   Q.   All right.  And then the second portion is those promoted

16   between July of '02 and January of '04?

17   A.   That's correct.

18   Q.   And if you turn to the second page, this is an example of

19   someone who receives 10 percent.  The last person who is listed

20   there, is -- could you tell us what that is?

21   A.   Biju George.

22   Q.   And do you know is Mr. George, is he Caucasian?

23   A.   No, he's not.

24   Q.   Is he of Asian descent, if you know?

25   A.   I know that he's not an American, yes.

1    Q.   Okay.   And he received a 10 percent raise?

2    A.   Yes, he did.

3    Q.   How does an employee go about getting a 10 percent raise?

4    A.   Again, as I mentioned before, the City policy allows with

5    the promotion a normal 5 percent increase.   With additional

6    justification by the superintendent to the director, an

7    approval can be made for 10 percent.   That then is submitted

8    and accepted by the City's HR department.   So there's also a

9    possibility that even downtown could question the 10 percent.

10   Q.   Once Mr. Bahar was transferred from wastewater engineering

11   to wastewater collections, and physically describe where

12   that -- where those two different divisions are housed.

13   A.   The engineering division is at 1600 Gest Street in Price

14   Hill.   The wastewater collections division is on Galbraith Road

15   by Drake Hospital.

16   Q.   All right.   Once he was shifted, did you receive any

17   information from wastewater collections that Mr. Bahar was

18   performing job duties outside of his classification?

19   A.   I don't recall that.

20   Q.   All right.   And did you receive -- did your department, to

21   your knowledge, receive any complaints after he was transferred

22   regarding any kind of discrimination complaint while he was at

23   wastewater collections?

24   A.   Not to my memory.

25   Q.   All right.   Those are all the questions I have for you now,

1    Mrs. Johnson.   Thank you.

2            THE COURT:   Thank you, ma'am.   You may step down.

3            Approach.

4    SIDEBAR CONFERENCE

5            THE COURT:   My standing order says counsel shall

6    expect direct, cross, and redirect.   I almost never grant

7    recross.   What do you have?

8            MR. FREKING:   I have very little.

9            I guess I'm confused only because they've just done

10   their direct.   I mean, I did -- well, it puts us in a bind.   We

11   would normally have --

12           THE COURT:   It's a little different.

13           MR. FREKING:   Yeah, it's a little different.

14           It's not going to be lengthy.   She's -- I think they

15   said a few things today that differed from what she said

16   yesterday.   I just want to get those clarified and then follow

17   up on some things he said.   Very -- I got five -- or it will be

18   short.

19           THE COURT:   I'll allow it --

20           MR. FREKING:   Okay.

21           THE COURT:   -- with this witness.   But I just wanted

22   to make sure everyone is on notice about it.   Okay.

23           MR. FREKING:   Okay.   So if we call somebody on cross

24   in our case in chief, then they put them on in their case in

25   chief, have we somehow -- have we waived our right under your

1    standing order to ask them questions in their case?

2          THE COURT:  Not necessarily, as you can tell by my

3    ruling with respect to this, but I want to know what it's

4    about.

5          MR. FREKING:  Okay.

6          THE COURT:  Okay.  All right.

7          MR. FREKING:  We'll usually be pretty short, I think.

8          MR. GIGLIO:  Thank you.

9          MR. NESTOR:  Thank you.

10          MR. GIGLIO:  Thank you, Your Honor.

11    SIDEBAR CONFERENCE CONCLUDED

12          THE COURT:  She escaped.

13          Will somebody please get the witness?

14          She's probably out the front door already.

15          MR. FREKING:  I think I've seen a commercial with

16    somebody running through the airport out of the courthouse.

17          COURT SECURITY OFFICER:  She totally escaped.  I'll

18    get the radio and see if I can catch her before she gets out

19    the door, Your Honor.  What is that lady's name?

20          THE COURT:  Miss Julia Johnson.

21          Anybody else warm?  Too warm?

22          Okay.

23          COURT SECURITY OFFICER:  They have retrieved her.  She

24    will be right back.

25          THE COURT:  Thank you.

1    MR. FREKING:  Your Honor, maybe while we're waiting,

2    could I request that the document that she was handed be marked

3    as Plaintiff's Exhibit 14?

4    THE COURT:  Any objection?

5    MR. NESTOR:  No.  No, sir.

6    MR. FREKING:  We'll make copies at lunchtime or

7    something and put a label on it.

8    THE COURT:  Very well.

9    Are you moving its admission?

10    MR. FREKING:  We move for its admission.

11    MR. NESTOR:  No objection.

12    THE COURT:  Very well.  Admitted.

13    (Ms. Johnson entered the courtroom.)

14    THE COURT:  You're quick.

15    COURTROOM DEPUTY:  Do you want her to have it back?

16    MR. FREKING:  Yes, please.

17    THE COURT:  Mr. Freking has just a few questions for

18    you.

19    Go right ahead.

20    MR. FREKING:  Thank you.

21                    CROSS-EXAMINATION

22    BY MR. FREKING:

23    Q.  Ma'am, I had not seen that document before this morning.

24    The document you refreshed your memory with on Wendell Young's

25    start date in MSD --

1    A.  Yes.

2    Q.  -- it appears to be August 19th?

3    A.  August 19th, 2000.

4    Q.  I think you testified yesterday that you believed Mr. Young

5    was in his role as the EEO officer in MSD when Mr. Bahar filed

6    his -- we looked at those e-mails yesterday dated July 5th --

7    25th and July 27th of 2000.  Do you recall that?

8    A.  Now please refresh my memory.

9    Q.  Well, let's just -- obviously do you recall that Mr. Bahar

10   got his reprimand on July 10th?

11   A.  Yes.

12   Q.  If he filed an internal EEO complaint on July 25th or July

13   27th, obviously Mr. Young had not become the EEO officer yet of

14   MSD?

15   A.  That would be true.

16   Q.  So the appropriate person would have been to go to I think

17   you mentioned Chandler and Farria?

18   A.  No.  The -- if he filed an EEO complaint and Mr. Young was

19   not there, he would have gone to Mr. Chapman as he did.  Okay.

20   Q.  Okay.

21   A.  I think yesterday my memory recollection of your question

22   was had he had -- Mr. Bahar had any contact with me, and I said

23   it might have been with my staff.  I don't recall directly with

24   me.

25   Q.  You don't recall mentioning Wendell Young yesterday?

1    A.   And I thought that was pertaining to the reclassification

2    piece, not the -- not the complaint.

3    Q.   Okay.  If you would look at that exhibit you identified

4    this morning as Defendant's Exhibit 2003.  Okay?

5    A.   Yes.

6    Q.   And this is the thing about the ten-year rule; right?

7    A.   Yes.

8    Q.   On the second page?

9    A.   Yes.

10   Q.   Now, would you agree with me that this rule actually says

11   that a person who has been there for ten years, quote, will be

12   reclassified without any qualifiers, like you said yesterday

13   only when there is a need?  It doesn't say anything about doing

14   it when there is a need?

15   A.   No.  The class spec says "will," yes.

16   Q.   Okay.  When policies say something will happen, they should

17   happen?

18   A.   They -- so your point being in '98 it should have happened.

19   Q.   If you're following the policy.  The policy says the

20   incumbent will be reclassified?

21   A.   Yes.  The class spec says that, yes.

22   Q.   And --

23   A.   For these six individuals it did not happen.

24   Q.   And was there a need -- is it your testimony this morning

25   you were told in 2000 that there was a need for six P.E.s to

1    replace the EITs?

2    A.  I -- it is my testimony that Mr. Karney said we need to go

3    about hiring engineers with professional license and that part

4    of that action was reclassifying all of the EITs who had not

5    gotten their professional license in order to be able to fill

6    engineering positions for MSD.

7    Q.  Okay.  Maybe I'm just missing something in the translation.

8    It would seem to me if I was in that position and he said we've

9    got to get some professional engineers, my next question would

10   be how many before I decide how many I'm going to move out of a

11   job; right?  If you're going to move six people out, wouldn't

12   it be logical to say are we going to fill these six slots with

13   six people or not?  Maybe I'm wrong.  He just said I need some

14   new P.E.s and somebody decided to move six?

15   A.  Okay.  I cannot recall the specific conversation from

16   Mr. Karney in terms of numbers of people, but I do know from

17   the moment we moved the EITs we proceeded with advertising and

18   bringing in senior engineers with license; and we have

19   continued to do that since this move.

20   Q.  And you don't know whether or not you've hired six P.E.s or

21   not?

22   A.  I am -- over the span since that time, I'm sure we have

23   brought in engineers.

24   Q.  How about in calendar year 2000, do you know whether you

25   hired six P.E.s?

1    A.   I'm sorry, I cannot recall that.

2    Q.   All right.  Thank you.  No further questions.

3              THE COURT:  Is that all of this witness?

4              MR. NESTOR:  Yes, sir.

5              THE COURT:  Now you can go.

6              THE WITNESS:  Now I can leave.

7              THE COURT:  Yes.  Thank you.

8              And plaintiffs may call their next witness.

9                          * * *

10                 EXCERPT OF PROCEEDINGS CONCLUDED

11                          - - -

12

13

14

15

16                 C E R T I F I C A T E

17         I, Julie A. Wolfer, the undersigned, do hereby

18   certify that the foregoing is a correct transcript

19   from the record of the proceedings in the above-entitled

20   matter.

21

22                    s/Julie A. Wolfer
                      Julie A. Wolfer, RDR, CRR
                      Official Reporter
23

24

25

1                          <u>INDEX</u>

2
                                <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>    <u>Recross</u>
3      <u>PLAINTIFF'S WITNESSES</u>:

4      JULIA JOHNSON
          (by Mr. Freking)                 46
5

6      <u>DEFENDANT'S WITNESSES</u>:

7      JULIA JOHNSON
          (by Mr. Nestor)        53
8         (by Mr. Freking)                 77

9

10

11     <u>EXHIBITS</u>                                    <u>ADMITTED</u>

12     Plaintiff's Exhibit 7                          47
       Plaintiff's Exhibit 14                         77
13
       Defendant's Exhibit 2023                       50
14     Defendant's Exhibit 2022                       60
       Defendant's Exhibit 2003                       61
15     Defendant's Exhibit 2098                       69
       Defendant's Exhibit 2093                       71
16

17                          - - -

18

19

20

21

22

23

24

25