1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3          WESTERN DIVISION

4                    - - -

5   ALI BAHAR,                    :   CIVIL NO. 1:01CV798

6          Plaintiff,            :   (Consolidated with
                                     CIVIL NO. 1:02CV697)
7      -vs-                      :
                                     Fifth Day of Jury Trial
8   CITY OF CINCINNATI,           :
                                     Tuesday, January 25, 2005
9          Defendant.            :   Covington, Kentucky

10                   - - -

11         EXCERPT OF TRIAL PROCEEDINGS
                CLOSING ARGUMENTS
12    BEFORE THE HONORABLE MICHAEL H. WATSON, JUDGE
                    AND JURY

13                   - - -

14

15  For the Plaintiff:   Randolph H. Freking, Esq.
                         Kelly Mulloy Myers, Esq.
16                       Freking & Betz
                         215 East Ninth Street, Fifth Floor
17                       Cincinnati, Ohio  45202

18  For the Defendant:   Augustine Giglio, Esq.
                         Terrance A. Nestor, Esq.
19                       Assistant City Solicitors
                         Room 214, City Hall
20                       801 Plum Street
                         Cincinnati, Ohio  45202
21

22  Law Clerk:           Dorothy Gass

23  Courtroom Deputy:    Barbara Crum

24

25  Court Reporter:      Julie A. Wolfer, RDR, CRR

                    - - -

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

**PROCEEDINGS**

* * *

MR. FREKING:  Okay.  Thank you, Your Honor.  May it please the Court.

Ladies and gentlemen of the jury, first of all, as we said in opening statement, thank you for your time and attention this week.  It's probably gone on a little bit longer than you would prefer, but for one reason or another that seems to be how things sometimes happen.

When we stood up here in opening statement, we gave you an outline of what we would prove during the case.  I think throughout the testimony this week we've done what we said we would do in opening statement and we've done more than what we said we would do.  It is a very clear picture that has emerged from the testimony.

First of all, Mr. Bahar was a very successful project manager for the City of Cincinnati.  Joe Niehaus, one of the first few witnesses on the witness stand, described him as a man of integrity and he said he was shocked when he learned that Mr. Bahar had been reprimanded by Mr. Campbell.

Other than the reprimand, there were no blemishes on his record in 16-and-a-half years of employment.  And he was a proud man.  He was proud of his accomplishments.  He came over here from Iran, moved to Chicago, moved to Louisville.  And after he got married, kind of working off and on supporting his

1    wife when she was in school.  He eventually got his degree in

2    1987.  He was proud of that and he wanted to be an engineer.

3    And he was treated as an engineer by the City of Cincinnati

4    until the spring of 2000.  He was a project manager with

5    extraordinary performance results, as we saw the very first

6    day, and it's Plaintiff's Exhibit Number 2.

7           And, unfortunately, beginning in 2000 we've seen a

8    career that has been derailed for no legitimate

9    nondiscriminatory or nonretaliatory reason.  And what's amazing

10   about the evidence that's in this record is that it's not only

11   been Mr. Bahar's career that has been derailed but it's been

12   the career of every other foreign-born high-level professional

13   that came into contact with Mr. Karney and Mr. Campbell.  And

14   we've heard from each of them how prior to 2000 they had

15   substantial roles and responsibilities within the organization

16   and slowly but surely those roles and responsibilities have

17   been chipped away at and been taken away.

18          The impact on Mr. Bahar has been significant.  I'm

19   going to talk to you in a little while about damages and what

20   you may award for him and what you do with your verdict, but

21   this case has never been about money.  It's always been about

22   principle for Mr. Bahar.  He's always wanted to stand up to an

23   organization in MSD that just had this knack for treating

24   people differently who were foreign born and people of color.

25   You'll remember one of the witnesses or one of the employees,

1    Mr. Campbell, could just describe, well, he was dark skinned,

2    and he was one of the people treated differently.

3        And I talk about the impact on Mr. Bahar because we

4    all know how important people's jobs are.  And in Mr. Bahar's

5    case, I think it's extraordinarily important because of his

6    background and the work he's gone through to get his degree and

7    the work he's gone through to progress and be respected in this

8    country by virtually every colleague he's ever worked with.

9    Two exceptions:  Campbell, Karney.

10        You know, jobs are important to people.  They're the

11    very soul of some people.  I almost laugh sometimes, I always

12    notice in the obituaries, because I'm an employment lawyer,

13    when people die, the headline's usually so and so, comma,

14    engineer; so and so, comma, architect; so and so, comma,

15    something else.  You meet people for the first time; after

16    getting introduced to them, the next question invariably is

17    what do you do?  And we're not meeting are you a father, are

18    you a mother, are you a citizen volunteer?  The question is

19    normally what do you do, what job do you hold?

20        And it's the impact on this on Mr. Bahar's life since

21    2000 we're talking about.  There is no legitimate reason for

22    Mr. Bahar to be treated in the way he was beginning with the

23    criminal investigation of Mr. Bahar in 2000.

24        The pattern is so stark because it's a relatively

25    short time frame.  We've got a common decision maker in all of

1    these cases.   We've got one department we're talking about.

2    We're talking about MSD.   All had stellar performance records

3    up until the arrival of Mr. Campbell and Mr. Karney, and all of

4    them testified about how their careers were derailed.   And you

5    could see the pain in their faces and hear it in their voices.

6    I don't want to describe them as angry, but you could tell that

7    there was deep disappointment in how these gentlemen had been

8    treated by MSD.

9              Mr. Huang testified about how he was a supervisor,

10    head of an area with 120 to 130 people reporting to him, and

11    that was taken away, now supervising 2 or 3.   And they

12    characterize that as a lateral move because the City wants to

13    tell you that if we don't affect your pay, everything is

14    lateral.

15              Well, ladies and gentlemen, you do not leave your

16    common sense at the front door when you come into this

17    courthouse.   You know how for yourselves whether or not a

18    material change in your job or your job responsibilities and

19    how you feel at work without necessarily your pay being

20    affected.   It's not all about the money as the City wants to

21    make it.   They want you to believe that they can treat people

22    however they want to treat them as long as they don't affect

23    their pay.

24              I suggest to you that one reason Mr. Bahar was treated

25    in the manner that he was treated was because Mr. Campbell,

1    Mr. Karney, consciously or unconsciously, wanted him to quit

2    and give up.  And they expected all of these -- one or more of

3    these folks to quit.  And these are men of principle and they

4    expect that to be recognized in this courtroom.

5          Donepudi, Rao Donepudi, very interesting story.

6    Campbell arrives on July 19th, 1999, and, lo and behold, early

7    the next year he decides that he can judge Mr. Donepudi's work

8    performance for the entire year of 1999.  And he takes his

9    extraordinary step and says I'm going to compare my rating of

10   his with Mr. Huang's, and, lo and behold, Donepudi's

11   performance rating goes down.  Had never done that with an

12   employee previous, has never done it since.

13         Donepudi was passed over when the job above him became

14   available and was given to an American-born person by the name

15   of Kesterman.  Donepudi testified that he now does virtually

16   nothing on his job.  Again, it's a material change in job

17   responsibilities.

18         Saeed, Mr. Saeed, one of these engineer-in-training --

19   engineers-in-training who were told, well, you can't be an

20   engineer-in-training anymore, you need to go get your P.E.  He

21   goes and gets his P.E., he expects to be transferred or

22   promoted to senior engineer, and the City says, sorry, we were

23   kidding.  This is bait and switch time at MSD.

24         Mr. Schneider, as much of a good friend he is with

25   Mr. Campbell, was forced to testify under oath yesterday that

1    obtaining your P.E. makes it automatic that you will be

2    promoted to the position of senior engineer.  The City has

3    offered no explanation why they forced Mr. Saeed, another

4    foreign-born individual, to go through Civil Service

5    Commission, the Court of Common Pleas, and the Court of Appeals

6    to get what was automatic for American-born individuals.

7            Sam George testified, virtually all of his duties have

8    gone.  His responsibilities on paper in the Cincinnati

9    municipal code are the same, but all of his duties and

10   responsibilities have been taken away.

11           One of the issues you're going to have to decide, the

12   City is going to try to argue that somehow because his pay was

13   not adversely affected, that Mr. Bahar never was treated

14   adversely on the job.  We suggest to you that the evidence

15   proves pretty convincingly that the cumulative effect of all of

16   the treatment of Mr. Bahar constitutes substantial adverse

17   action.

18           And I'd like to just run through the evidence of the

19   adverse actions that have occurred to Mr. Bahar.  Number one,

20   first and foremost, you talk about an improper motive, the

21   criminal investigation.  Now, you know, we can all disagree

22   whether Quinn ran a loose ship, we can disagree whether Quinn

23   gave out verbal okays that maybe he should not have, we can

24   disagree about whether or not the commissioners would have been

25   happy or unhappy with how Quinn ran his ship; but worst case

1  scenario in this entire blowup that resulted to the reprimand

2  was that some documentation was not written down.  Nobody

3  questions the legitimacy of the charges, whether this company

4  Black & Veatch should be paid for the work that Mr. Bahar was

5  involved with, and somehow Campbell and Karney decide they're

6  going to refer this up to the law department to see if we can

7  charge him with a crime.  Mr. Karney was asked yesterday the

8  basis for that, and he said something like, I don't know, when

9  I started with the City I heard that if somebody commits a

10  crime and you're part of it, that you can be held liable also.

11  That's the silliest explanation I ever heard in my life.

12  Nobody before or since Mr. Bahar has been subjected to that

13  kind of treatment.  Nobody else has been referred by Campbell

14  or Karney for a criminal investigation.

15        Think about that.  What happened.  There was not a

16  written authorization for a change form on a job, and somehow

17  they think he's going to be charged with a crime?

18        Then he gets reprimanded.  You know, the fact of the

19  matter is the first step in the progressive discipline system,

20  as Miss Johnson told you, the very first witness in the case,

21  was an oral reprimand.  What they should have done to Mr. Bahar

22  if it was consistent with their policy that they were going to

23  do anything at all was they could have walked up, put their arm

24  around him, and said, listen, three years ago you should have

25  gotten a written authorization; we've got a new regime in order

1  here; please follow -- make sure you get written authorizations

2  in the future, okay; it's a new regime in town, it's not the

3  Quinn regime anymore; do things differently.  And that would

4  have taken care of the problem.  Instead, they have to go over

5  the top and reprimand him.

6          Then you have the reclassification.  This rule has

7  never been enforced before by the City.  It's been on the books

8  forever.  Last time it was enforced, according to Miss Johnson,

9  was sometime in the 1980s.

10          Well, he gets reprimanded.  He files an EEO internal

11  complaint, and all of a sudden it occurs to Mr. Karney,

12  Mr. Campbell, maybe we should reclassify the EITs.

13          Now, you've got some credibility issues to decide in

14  this case because they always -- when I was talking to

15  Mr. Campbell, they've always got some excuse to try to explain

16  away things.  And one way they want to explain away the

17  ten-year rule enforcement all of a sudden is they want to say,

18  well, that wasn't our idea; that was the idea of HR.  Well,

19  last Wednesday when we started, Miss Johnson told you who

20  started the ten-year rule stuff?  It was Mr. Karney.  Out of

21  the blue coming to her about the ten-year rule.  All of a

22  sudden after the EEO internal complaint was filed, they want to

23  enforce this rule that had not been enforced since the 1980s.

24  And guess who is going to be first?  The guy who was one of the

25  top two people in that department is going to be the first guy

1    reclassified.

2           Now, think about that.  They've got -- we're going to

3    get to whether there was an opening in wastewater collection or

4    not, but they wanted to send him to wastewater collection.

5    It's a less desirable place.  So think about the logic of,

6    okay, we got an opening over here in wastewater collection.

7    Who are we going to pick?  Mr. Bahar.  The most experienced,

8    the most well-respected EIT they had is selected to go down to

9    wastewater collection.

10          Mr. Campbell and Mr. Karney can almost not contain

11   themselves.  You'll see the document August 18th, 8:30 in the

12   morning, there is a Civil Service Commission meeting or

13   something at which this change in classification is approved.

14   By 11:30 they're up talking to Mr. Bahar saying we are going to

15   send you to wastewater collection.

16          That was acknowledged, at least Mr. Campbell

17   begrudgingly acknowledged that wastewater collection was viewed

18   as a less desirable place.

19          The transfer there was unlike anybody else.  Everybody

20   else who was an EIT was allowed to stay in their department.

21   The other people that were EITs were generally in wastewater

22   engineering.  They remained there.  They did the same exact

23   job.  Their titles were just changed from EIT to CET-4.  On the

24   other hand, Mr. Bahar's job was completely changed and his

25   responsibilities in wastewater collection amounted to nothing

1    at all.

2            What did their witnesses say about that?  Well, they

3    had three or four people come in yesterday.  Mr. Johnstone,

4    again, this is on cross-examination after he's fed you a good

5    story, he finally admits what he admitted in his deposition,

6    that contrary to what Mr. Campbell and Mr. Karney testified

7    under oath about there being this need for somebody in

8    wastewater collection, Mr. Johnstone testified yesterday there

9    was no vacant position at the time.  And that's why there was

10   no work for Mr. Bahar to do and that's probably why he had no

11   chair, no phone, no computer.

12           Mr. Johnstone contradicted Mr. Campbell, Mr. Karney.

13   Their credibility is seriously in jeopardy.  And when the

14   credibility of Mr. Campbell and Mr. Karney are in jeopardy, the

15   liability of the City becomes fairly clear.

16           Mr. Wiemer yesterday, he took over supervision of

17   Mr. Bahar in late 2001, early 2002.  He said his primary task,

18   that is the primary task of Mr. Bahar, was map making and

19   involved no mechanical engineering skills.

20           Mr. Schneider testified.  He was social friends and --

21   with Mr. Campbell and still has a business relationship with

22   the City of Cincinnati.  He confirmed that obtaining your P.E.

23   license is a ticket to becoming a professional -- to becoming a

24   senior engineer, contradicting the story about Sohail Saeed.

25           And Mr. Schneider, he was the superintendent of

1    wastewater treatment supervising 420 people, millions and

2    millions and millions of dollars, supervising engineers.  Now,

3    supervising the engineers, and guess what?  They waive the

4    requirement that he have a P.E. license for that job.  How

5    convenient was that?  He's American born, we're going to waive

6    the P.E. requirement for this guy, but we're not going to waive

7    the P.E. requirement for the engineers-in-training so that we

8    can move Mr. Bahar to a less desirable place of wastewater

9    collection.

10           Mr. Bahar suffered humiliation, embarrassment, and

11   degradation while he was in wastewater collection.  Then when

12   he's in wastewater collection, he dutifully does what the City

13   suggested he does.  He went out and got his P.E. license.  He

14   gets his P.E. license.  He comes back with Mr. Campbell, says,

15   Mr. Campbell, I worked in wastewater engineering for 12 years,

16   I had stellar performance reviews, I would like to come back to

17   wastewater engineering and become a senior engineer.  Guess

18   what?  Campbell says no room at the inn.  The reason he says

19   there's no room?  The direct quote from his deposition and he

20   admitted on the witness stand, lack of trust in Ali Bahar.

21   Ladies and gentlemen, that's code words for retaliation.  He

22   didn't trust the guy who stood up to him and notified the City

23   that he believed he was a victim of national origin

24   discrimination by Mr. Campbell.  That is code words.  That's a

25   virtual admission that you are retaliating against someone who

1  is engaged in protected activity.  You don't trust the whistle

2  blower when you're the boss.  And that's what Mr. Campbell

3  admitted to you.

4          Mr. Bahar was eventually transferred over to the storm

5  water, even though he had no prior experience with storm water

6  and it did not involve much use of his mechanical engineering

7  skills.

8          Even when he went over to storm water, the boss says

9  or makes a recommendation that Mr. Bahar ought to be trained

10  for a senior engineer job in this new area for him, storm

11  water, new area of storm water.  And guess what?  A training

12  request comes up to Mr. Campbell, a training request to learn

13  his job; request denied.  No legitimate reason has been offered

14  by the City for the denial of that training request.  And so

15  he's still stuck in storm water as a senior engineer even

16  though where he belongs and where he did a wonderful job was in

17  wastewater engineering.

18          It's this cumulative effect of this adverse treatment

19  from 2000 really to the present that constitutes a substantial

20  adverse -- the substantial adverse actions for Mr. Bahar.

21  Remember, no other EIT was transferred like Mr. Bahar was

22  transferred to duties in which he had virtually nothing to do

23  when he was in wastewater collection.  Sure, he did a little

24  bit and, sure, he got good performance reviews, but he had

25  nothing to do and he wanted to be a productive member of MSD.

1        Now, one of the things you have to wonder about in a

2   case like this is credibility.  You know, I've been doing this

3   for a long time, about 20 years.  And an employer in a case

4   like this has such an incredible advantage over an employee.

5   The employee has no records.  The employee has to rely upon

6   what their recollection was of things that occurred.  They have

7   no opportunity to go out and get these records.  They've got to

8   go through extensive discovery with these guys.  You would

9   think an employer who takes adverse action against an employee

10  could at least keep their stories straight.  Employers lose

11  these cases when they can't keep their stories straight.

12        For example, on the reclassification issue and the

13  transfer, one of the central issues here was the transfer to

14  storm water collection.  Mr. Minges yesterday, Mr. Campbell --

15  let me take that out of your view for a second.  Mr. Campbell

16  testified under oath that Minges, the guy in wastewater

17  collection, wanted Ali Bahar, came to him with a need.  First

18  of all, Mr. Johnstone has already said there was no vacant

19  position.  Well, we have Mr. Minges up here and after he told a

20  different story when he was testifying, we showed him his

21  deposition testimony:  During the discussions with Mr. Campbell

22  that resulted in Mr. Bahar being placed in that vacant

23  position, who first mentioned Mr. Bahar?  I don't have any

24  idea.

25        Now, if Mr. Minges had come to Mr. Campbell and

1  specifically wanted Mr. Bahar, you would think he would have an

2  idea as to who mentioned Mr. Bahar.

3         You've got a series of these credibility issues.  And,

4  again, an employer, you would think, could get their story

5  straight.

6         The referral to the law director, Johnson said only

7  serious issues would be referred to the law director for

8  possible criminal investigations.  Karney yesterday gave

9  some -- I don't even know how you describe his explanation.  It

10 was no explanation at all.

11        The reprimand.  Niehaus is known for his good notes.

12 Niehaus came in and testified and said I told him exactly the

13 opposite; it might have been in there, it might have not been

14 in there; don't use it against Mr. Bahar if it's not in there.

15 And Campbell runs with this lack of notes and tells Karney that

16 Mr. Niehaus was known for his good notes, completely contrary

17 to what Mr. Niehaus told them.

18        The decision to enforce the ten-year rule.

19 Miss Johnson the very first day, I said why did you have to all

20 of a sudden enforce the ten-year rule?  Because there was a

21 need to do so.  Campbell said no, it didn't have to be a need;

22 it was automatic.  The reason he had to run away from the need

23 thing is because they didn't go out and hire a bunch of

24 professional engineers.  They didn't have a need to move these

25 EITs out.  It was an excuse and nothing more.

1          Who prompted the reclassification?  We talked about

2   that earlier.  Miss Johnson testified it was Karney who came to

3   her.

4          Who prompted the wastewater collection transfer?

5   Minges, I just showed that to you, I have no idea who brought

6   up Mr. Bahar's name.  And Campbell says it was clearly Minges.

7          And was there a vacant position in wastewater

8   collection?  Johnstone says no and, again, Campbell says yes.

9          You would think that if all of these guys still work

10  there or are recently retired from the City of Cincinnati, you

11  would think that if they had credible explanations for how they

12  treated Mr. Bahar, they could keep their stories straight.  But

13  they can't.

14          Finally, I want to address before Mr. Giglio argues

15  and then I'll have a short chance for a rebuttal is the issue

16  of damages.  The case like this because Mr. Bahar has not been

17  fired, you have a very difficult task.  I think I mentioned

18  this in opening statement.  You're going to have the job --

19  there's no mathematical formula to figure out the value of

20  what's happened to Mr. Bahar, how he has felt emotionally.

21  Laura Bahar testified about how he was a changed person

22  comparing how he was before the reprimand and all this nonsense

23  that happened and today.  She testified very credibly about the

24  impact on him and his family.  Mr. Bahar kind of humbly

25  testified about that and he admitted that he doesn't like to

1    admit the extent of emotional distress that he suffered.

2            How did Mr. Bahar -- how did he feel when he was put

3    in these demeaning, degrading jobs with virtually nothing to

4    do?  How did he feel when he found out that Mr. Lutz gets hired

5    as a senior engineer in wastewater engineering off the street,

6    he gets paid $70,000 a year?  He gets promoted to senior

7    engineer; he stays in the mid fifties.

8            You're going to have to figure out some formula, the

9    collective wisdom of the eight of you, that somehow values that

10   suffering that Mr. Bahar has suffered and the damages occurred

11   to him.

12           One way to look at it is if you were a professional,

13   how much would you want to be paid if you were forced to endure

14   a frivolous criminal investigation against you, you were forced

15   to put up with this unnecessary reprimand, you were forced to

16   work in locations of your workplace that were undesirable and

17   given no work for years, months and years?  How much would you

18   demand to be paid to put up with that kind of treatment on the

19   job?  One way to look at it.

20           Another way to look at it might be the situation of

21   humiliation is the amount of money that you think you'd be

22   entitled to for a day, on some kind of day or weekly formula

23   for being subjected to this kind of humiliation and

24   embarrassment.  But that's, again, that's why we have eight

25   people in a jury box.

1        Frankly, that's the most difficult decision you have

2    to make is not whether he's entitled to judgment but it's going

3    to be the calculation of damages for which he's entitled

4    because he was the victim of national origin discrimination,

5    treated differently than American-born people, and it's borne

6    out by the pattern.  He was a victim of retaliation because

7    shortly after he engaged in protected activity, he was

8    subjected to a series of adverse employment actions.

9        So as I said before, thank you for your attention this

10   week and during this closing argument.

11       THE COURT:  Thank you, Mr. Freking.

12       Mr. Giglio, you may give your closing argument on

13   behalf of the defendant.

14       MR. GIGLIO:  Thank you, Your Honor.

15       Ladies and gentlemen, on behalf of the City, I want to

16   thank you as well for your patience, listening to all the

17   evidence before rendering a decision, and for all your time.

18   This case did take a little longer than I think we all wanted

19   it to take, but we appreciate you listening to everything.

20       As you can see from the procedure, Mr. Freking got to

21   speak first and he will get to speak after I conclude my

22   argument to you.  And, again, that goes to the basic

23   fundamental basis we're all here, the plaintiff, not the

24   defendant, the plaintiff has the burden of proof.  So that's

25   the reason he goes first, I go second, and he gets another

1    opportunity after I sit down to talk to you again.

2              I think what I need to address first is what my

3    impressions of this case is all about.  This case is not one of

4    discrimination.  It's a case of pride.  I'm not saying that

5    pride is wrong or incorrect.  Everyone is entitled, I think I

6    mentioned that in my opening statement, to be proud of what

7    they do, to be proud of their accomplishments.  But pride

8    sometimes can get in the way of the truth, and that's what

9    happened here.

10             This is no reflection on someone, you've heard over

11   and over the fine record of this man.  The City has not

12   contested that.  In fact, every one of our witnesses I asked

13   how was his job work?  Very good.  Excellent.  That's not the

14   issue.

15             The issue also is not what one person subjectively

16   feels is the reason for what bestows upon them.  A lot of

17   things happen to all of us in life.  I think a very telling

18   comment by Mr. Freking is you have to accept responsibility.

19   Things happen.  Good things happen.  Bad things happen.  There

20   is a reason for it all.  But it isn't always because of someone

21   conniving, planning, plotting to discriminate against them.

22             I can't put myself in the head of this individual.  I

23   was not born in Iran.  I do not know the feelings and concerns

24   of someone born in that part of the world that would be

25   concerned how other people look upon them.  I can't.  I can't

1   do that.  That would be ridiculous on my part.  But that's what

2   we're dealing with here is perception.  But there has to be

3   proof.  There has to be evidence.

4          We heard repeatedly of this criminal investigation.  I

5   think we were all in the same courtroom.  We were all awake.

6   We were all listening.  You heard witnesses from that chair.

7   Is there any criminal investigation on this gentleman?  No.  To

8   the contrary, there was not.  Hear it.  It wasn't criminally

9   investigated.

10          We hear the issue of the cumulative effect of adverse

11  action.  Granted, the City would point out to you that there

12  was no adverse action because we believe there wasn't.

13          The first item mentioned by Mr. Freking was the

14  reprimand.  You saw the reprimand, you saw how it was written,

15  what it stated.  You heard every witness testify as to the

16  effect of it.  None.  You heard -- you heard no testimony that

17  jobs were applied for and because of that reprimand he didn't

18  get them.  You heard nothing like that.  There was no evidence.

19  There was absolutely nothing.

20          Pride hurt?  Again, we go back to pride.  Certainly.

21  Certainly.

22          We go to the situation of the basis of the reprimand.

23  You may not even agree, you may agree with Mr. Huang.  You

24  know, I don't know what happened before.  You fellas came, you

25  being the new administration, but let's just all forget about

1    it.   Maybe you would replace your own judgment and maybe you're

2    sitting there going that's -- I wouldn't have done anything.

3    You might not have.   But was the actions taken by MSD and

4    Mr. Campbell when this came to light, when you heard the

5    concerns of standard operating procedure spending money that

6    hasn't been authorized, usurping the authority and duty of the

7    county commission who they have to deal with on a regular basis

8    on millions of dollars of projects, that's a concern.   That's a

9    serious situation.

10            We talk about the investigation by Mr. Campbell, the

11    fact that Mr. Niehaus and his notes, the discrepancies.   You

12    look at the -- and it's in evidence.   You look at the memo that

13    Mr. Campbell wrote to Mr. Karney, and what's he say in there?

14    He tells him I've talked to supervisor and superintendents and

15    they've told us what the plaintiff has said might be possible.

16    He's giving both sides.

17            You heard of the reprimand process.   You heard there

18    was no -- no involvement to do further acts, which they could.

19    They didn't.   That was it.   That's the adverse action of the

20    reprimand.

21            Now we get into the reclassification.   Who asked who?

22    You heard Mr. Karney say I was interested on the number of

23    engineers; HR came to me.   I think you can figure that out.   I

24    think you don't leave common sense at home.   Is that really a

25    conflict?

1        We have six people that are not all Iranian, they're

2   American-born, they're foreign-born, they're all reclassified.

3   One of the elements that you'll hear about in your charge, and

4   the Judge will give you a charge at a different time, whether

5   these similarly situated individuals, all of these people were

6   reclassified, all went from project manager duties to some

7   other duties within the classifications.  You heard repeatedly.

8   Mr. Johnson, Mr. Karney, Mr. Campbell, Mr. Huang, the need to

9   work people within the classification.  Mr. Minges, working

10  within the classification.  Mr. St. John, work him within that

11  classification.  There is a reason for it.  All treated the

12  same.

13        The plaintiff would have you believe that this mass

14  conspiracy is how can we discriminate against this gentleman,

15  how can we -- what can we do?  We'll just move an entire group

16  of people out, change all their jobs, and that will take care

17  of that.  You have to believe that?  Is that credible?

18        The argument made is that he went to a different

19  division.  You also heard evidence, and I don't believe you

20  heard any contra evidence, that employees of the Metropolitan

21  Sewer District do move from division to division.  That's what

22  happens.  It's all the same department.  They do that.

23        Get into the issue of whether there was a vacant spot,

24  a new spot, what the situation was.  I think Mr. Minges hit it

25  right on the head.  You have to move quick or you lose the

1    spot.  This has been reinforced by other people who testified.

2    The City of Cincinnati, if it's vacant, you're not using it,

3    you're losing it.  Plain and simple.  And what bears that out,

4    what shows that that's absolutely true is that when Mr. Bahar

5    did get his promotion and was promoted and received the senior

6    engineer position, they didn't fill it quick enough.  There was

7    no list.  They took it away.  Mr. Minges said they took it

8    away.  He eventually got it back and had to take a different

9    scenario to do the CET-4 position work.  They took it away.

10   That's how it happens in the City.

11          We get into the issue of this cumulative effect, and I

12   think this is important because you look at the situation of

13   Mr. Lutz, this man that was hired.  He was hired, and you may

14   recall and you'll have in the jury room exhibits, you'll have

15   Mr. Bahar's sworn affidavit under oath in 2001 that he believed

16   he was retaliated against and discriminated against because

17   someone with lesser skills than he had got the job, namely,

18   Mr. Lutz, and paid a lot more.  Again, he may believe that.  He

19   certainly had the record.  He certainly has the skills.  He's a

20   knowledgeable individual.

21          This is no reflection on him in that regard.  The job

22   opening was for a senior engineer.  A senior engineer

23   repeatedly testified to and uncontradicted must have a

24   professional engineer license.  In 2001, May, Mr. Bahar did not

25   have that license.  He couldn't apply for that position.  He

1   got his license in 2002.

2          To claim that he's been discriminated against may give

3   you a little better insight of the mindset here.  What is he

4   thinking?  Is he angry?  I don't know if he's angry.

5   Disappointed?  I don't know.  Upset?  I don't know.  But he

6   sees somebody now doing work that he feels he's as qualified,

7   if not more than qualified; because he's hired on the outside

8   where the market changes what bears, he's making more.  So

9   what's he claim it is?  It's discrimination.  It's

10  discrimination.  It's retaliation.

11         Again, you don't leave your common sense at home.

12  When you look at the issues of who has control here, Mr. Karney

13  encouraged plaintiff to get a P.E. license.  Plaintiff thanked

14  him, sent him -- thank you for talking to me in March of '99,

15  challenging me to get that.  Mr. Karney knew that's -- you want

16  to advance, that's what you got to do.  He did.  He was

17  promoted to senior engineer.  He got an increase commensurate,

18  no evidence to the contrary, with others.  And I think there is

19  some of those individuals you saw, you'll have an exhibit, that

20  actually got more.  One of them was a gentleman named Biju

21  George, foreign born.  He actually got more.  So we'll talk

22  about patterns and practices here.  I think that's something

23  you need to consider.

24         I think you also need to consider the duties, the

25  duties of the CET-4 was obviously doing different work.  Was it

1    work he wanted to do?  He wanted to stay in wastewater

2    engineering.  The City is going to argue that's what he wanted,

3    but he didn't have a license.  He changed classifications.

4            And I think what's really telling here is the

5    plaintiff's own witnesses.  I don't believe you would believe

6    Mr. Huang is opposed to Mr. Bahar.  I don't believe that you

7    would take his testimony as one of favoring the City.  He has

8    his own complaints.  But what did he say?  What did he say when

9    I asked him, well, what about the other EITs?  When those

10    project manager jobs were taken back to Mr. Bahar, what about

11    the other witnesses?  I treat them all alike.  They were all

12    taken back.

13            It's their witness.  There's no evidence that they did

14    the same thing.  Did he stay in the same division?  He did.

15    And, in fact, the gentleman's name keeps coming up, Sohail

16    Saeed.  I'm not sure of the nationality, I think it's Pakistan,

17    but it doesn't matter.  I think it's been established he was

18    foreign born.  He was in, I believe, wastewater treatment and

19    he remained.  He remained for several months.  He wasn't

20    transferred.  He's foreign born.  He was given the opportunity

21    to stay because he was awaiting his P.E. license exam result.

22    He didn't pass.  Moved.

23            Now we're comparing -- are we comparing apples or

24    apples and oranges?  What are we comparing?  We have a

25    foreign-born individual who was foreign born who has a chance

1   to stay.  When he doesn't pass, where do they move him?

2   Wastewater engineering because that's where the slot was that

3   was available.  So we have to look at the entire picture when

4   you hear these allegations of discrimination.

5          You have the allegation of discrimination regarding --

6   I made a list here when Mr. Freking was discussing it.

7          Oh, I thought that was interesting.  Mr. Karney's

8   concern because of the prior administration, I think he used

9   the word "silly."  Mr. Karney said it was a grand jury

10  investigation of the prior full-time director.  Grand jury

11  investigation.  I don't know if it's silly to be concerned that

12  you're following the rules and the law when your predecessor

13  left under such a cloud.  What are you going to do when you

14  take that job and are you going to be just nonchalant, let it

15  go?  Well, the overages were all reasonable.  It was all

16  determined it was fine.  Forget about it.  You heard

17  Mr. Campbell say you can't forget about it.  You got to play by

18  the rules.

19         Now, when we get into these situations on

20  reclassification and reprimand, you also hear the argument that

21  when he was promoted, he wanted to be in wastewater engineer,

22  and where was he sent?  Storm water management under

23  Mr. George.  And I'll discuss Mr. George briefly in a moment.

24  He was given a very top critical job to handle.  Admittedly, no

25  engineers were really knowledgeable in that area, and there is

1    an allegation, well, he was denied training.  You heard

2    Mr. Campbell.  I think it was Mr. Campbell discussed, possibly

3    it was not, it might have been Mr. George, that the training

4    that was involved involved touching that area but had other

5    aspects to it.  But didn't you also hear in the testimony that

6    Mr. Bahar was sent to Florida, something today wouldn't be such

7    a bad thing to happen, sent to Florida for training?  If

8    someone has discriminatory intent underlying all their actions,

9    would you send somebody to Florida for training?  He wasn't

10   denied all his training.  Businessmen and managers have to

11   judge which is appropriate and what they think is the right

12   thing to do.  He was given that opportunity.  He did a good job

13   at it too.  The evidence is he put it together.  He worked on

14   it and the county -- somebody even copied it.  He was very

15   successful there.

16        You have the argument of the three individuals which I

17   think is also very interesting.  We'll start with Mr. Huang.

18   Mr. Huang is sewers chief engineer.  Mr. Huang no longer has

19   all the people working for him.  He takes that as some type of

20   an affront, okay.  I think that's obvious from his testimony.

21   He was placed in the regulatory response unit, no loss of pay,

22   obviously a totally different unit, doesn't have those people

23   there.  You have evidence that's been discussed.  You'll have

24   evidence in the jury room that a division head such as

25   Mr. Huang, there's only six of them.  A division head had to be

1    placed in that experience.  Because of his -- all his years of

2    experience, that's who you want.  I think it was 1.4 billion

3    dollar consent decree, thousands of dollars in penalties for

4    not keeping up the time requirements for the consent decree

5    with the government.  You put somebody like Mr. Huang there,

6    that's a stripping of his duties?  I don't think so.  That's a

7    demotion?  I don't think so.  He didn't lose any pay or

8    anything else.  Got all his pay increases.  Still there.  Still

9    with the City.

10         You have Rao Donepudi, another example alleged by

11   plaintiff of this insidious discrimination against foreign-born

12   individuals.  Mr. Donepudi's rating, Mr. Huang gave him a

13   hundred percent across the board.  Mr. Campbell looked at that

14   and questioned a hundred percent across the board?  Agreed with

15   many of the factors; knocked him down to 90.  That was a

16   terrible insult to Mr. Donepudi.  He was knocked down to 90

17   percent.  Had no effect on anybody, his pay or anything.  He

18   exceeds -- he's way above the average.

19         Then we have the situation that Mr. Huang, you

20   remember Mr. Donepudi said, well, I was recommended by

21   Mr. Huang to replace him in that division.  Remember that?  And

22   you heard Mr. Campbell testify when the time to replace that

23   critical spot was made, Mr. Donepudi along with other people

24   were sent to one of the largest seminar, conventions, whatever

25   you want to call it, dealing with this situation to attend it,

1    I think it was in Los Angeles, I'm not sure, it doesn't matter,

2    and they came back.  They were all asked to give some type of

3    essay response regarding that.  He doesn't do it.  He had a

4    written exam with HR.  He didn't do it.  He didn't do it

5    because, you know, I am eminently qualified; Mr. Huang says I

6    should have the job.

7            And I think that's important because the same thing

8    happened with the plaintiff.  When the plaintiff was in

9    Mr. Minges's department doing a fine job there, the position of

10   supervisor of manhole rehabilitation, I think it's called, came

11   up.  You heard the testimony there.  You heard that he was one

12   of three candidates selected by HR to have that position.  You

13   heard that he thought it was I'll use the term "fixed" that

14   this lady, Cindy Kron, already had the job.  They were buying

15   her doughnuts.  Her husband works there or her father.  It's a

16   done deal.  You heard Mr. Minges say that's not true,

17   encouraged them to take -- participate in the interview.  And I

18   think it's really important because we go back to pride.  He

19   had more education than Miss Kron.  He is an experienced

20   engineer.  The purpose of the interview was supervisory skills.

21   This is a different job dealing with employees who can work for

22   interaction, it doesn't matter if you can build a piece of

23   wastewater treatment equipment in your sleep blindfolded; that

24   is not the whole picture of this job.  Didn't want to

25   participate in it.  And I submit that's the same thing with

1    Mr. Donepudi.

2            I'm proud of what I do.  And I'm not making fun or

3    light of pride.  Pride, we all have pride in what we do.  I'm

4    proud to be a member of the bar and arguing here before you.

5    I'm sure you're proud to be jurors.  We should be proud of what

6    we do.  But sometimes you can't let that pride get in the way

7    of reality.  And that's what occurred here.

8            We have the situation with Mr. Saeed being denied

9    promotion.  Mr. Saeed -- you saw the evidence of career path.

10   Automatic.  Mr. Saeed was no longer an engineer-in-training.

11   He was now a CET-4.  There's no direct path.  There's sitting

12   for exams and you heard some other stuff.  And there's also the

13   ability of management to want to fill people or whether they're

14   going to fill a spot or not.  Therefore, it is at least implied

15   that that was discrimination against Mr. Saeed.  So we have

16   these situations.

17           And I think I'm leaving it for last because I think it

18   is a classic situation of blaming or pointing to discrimination

19   where it can't exist, and that's Mr. George.  Mr. George came

20   over to MSD in 1999, had never met Mr. Campbell.  Mr. Campbell

21   wouldn't know Mr. George if he tripped over him.  That was

22   acknowledged.  The decision to cut back -- what really

23   irritated Mr. George, and this is a sign of discrimination was

24   made before they ever even met.  I submit to you if you want to

25   discriminate against somebody because they're tall or short,

1   they're dark or light, whatever reason you want to give, it

2   would be nice to know what they are first so then you can make

3   your discriminatory choice.

4           In Mr. George's case, Mr. Campbell didn't even know

5   his position.  Sam George.  I'm thinking of Phyllis George, the

6   former First Lady of Kentucky.  I don't know if he's from

7   India, I don't think so but it doesn't matter.  There is no --

8   there was no reason for him to have a clue as to who Mr. Sam

9   George was as far as his nationality, but yet that's been

10  raised stripping him of the ability to do his responsibilities.

11  You have to look at the credibility of the situation.

12          When you get into credibility, you look at all the

13  witnesses, including the plaintiff.

14          Just touch on the testimony of plaintiff's wife.

15  Obviously, a very loyal, supporting wife.  Can't say anything

16  better than that.  It's interesting, however, that when they

17  asked -- when asked -- when her husband was denied these jobs

18  that he sought, including the position of Great American

19  consulting manager across the river, he deemed that in part due

20  to his Iranian background, his foreign background, origin.

21  That's not true.  I just did that on a flier.  I knew I

22  couldn't get the job.  I had nothing to do with it.

23          I don't think, as plaintiff's counsel has indicated,

24  they're asking you to believe her credibility as to the effect

25  of his job, how he liked or disliked his job.  I think you have

1    to consider the entire credibility.  And I think that's

2    correct.  I think she was being truthful when she said I

3    believe that was part of the reason he was denied.  He believes

4    that.  And that's not a fault.  I'm not saying that he's, you

5    know, when you are a nationality that's in the limelight to

6    some extent, the concern of it is there.  So there's nothing

7    wrong with it, but you have to look at the mindset.  Everything

8    behind every door is discrimination.

9             You have to talk about credibility.  We have

10   Mr. Johnstone.  You heard banished to a broom closet.  But I

11   think you heard enough evidence from a series of witnesses of

12   the nature of the facility at wastewater collection.  This was

13   not the Taj Mahal.  They were on top of each other.  I think

14   Mr. Minges said three or four in an office.  One of the first

15   projects given to the plaintiff was to seek more space.

16            They're talking about boots.  They're all assigned

17   boots.  This is a manhole operation.  This is where they climb

18   down into the manholes.  This is where they have TV cameras.

19   This is where a consent decree gets involved to make sure I

20   think it was -- I don't know if 300 or 3,000 miles of pipe but

21   a whole bunch of pipe has to be operated and working.  It's one

22   of those functions of the City that we just don't want to think

23   about.  It's like waterworks, you know, we turn the water on,

24   it's there.  It's there.  How it got there, sometimes it

25   interests us, sometimes it doesn't.  This is a function of

1    Metropolitan Sewer District.  That's what they do.

2              So you have that scenario.  You have that space.  He

3    wasn't told to be treated differently or poorly.  He was told

4    to be worked in class.  He obviously, as you'll see in his

5    complaints to the EEOC, complained about his working for --

6    reporting to a nonengineer.  That was I'm an engineer, I'm

7    qualified.  Again, we go to the pride scenario.  And Mr. Wiemer

8    admittedly is not an engineer but he's a supervisor, and

9    CET-1s, 2s, 3s, 4s report to him.  That is in the table of

10   organization.  Doesn't like it, but that's not adverse

11   employment.

12             I only have a few minutes and I want to make sure I

13   talk about the project manager scenario.  There is no project

14   manager on the table of organization.  I think the evidence

15   clearly established that.  Clearly, plaintiff over the years

16   repeatedly sought to have that made a classification and to be

17   paid the same as a senior engineer with a professional license.

18   No argument.  He did that from 1992, several times.  Didn't

19   happen.  He wants to be treated the same as a licensed

20   professional engineer.  The job he has at the time he couldn't

21   do that.  It's not only the City law, and that goes to some of

22   the testimony by Mr.  Schneider, and it shows when we get into

23   credibility the extent some people will go to prove their

24   point.

25             Mr. Schneider basically said plaintiff is trying to

1    set up Mr. Campbell.  Set him up.  It's not a pleasant thing to

2    discuss.  That was the testimony.

3             What kind of anger is behind this?  What motivates it?

4    I'm not going there, but it gets into the issue of what

5    motivates your testimony, what motivates your credibility when

6    you talk about no chair for weeks or days.  The same individual

7    sent an e-mail to the city manager.  That's pretty gutsy.

8    Again, I said in my opening statement there's nothing wrong

9    with expressing your opinions and fighting for your rights, but

10   we're talking city council, city manager.  Never a loss for

11   words.

12            There's some very telling comments in some of the

13   exhibits you'll see.  There were other employees who were given

14   awards, and one of them in there Mr. Bahar wrote them and said

15   the fact that you're getting this award, I'm paraphrasing it,

16   it makes me sick to my stomach because I was responsible for

17   that; you shouldn't get that.  Another one:  I wish you the

18   best of luck but, you know, that idea was always mine.

19            How else can I present it on behalf of the City?  This

20   gentleman has great pride and that is, again, is not a fault,

21   but it can cause vision and blindness.  It can cause things to

22   pop out that aren't there.  And in this particular case the

23   plaintiff has the burden.  The plaintiff has not shown the

24   element that you will go through.

25            Plaintiff also has the burden if the City expresses

1   legitimate reasons, they can be any reason, any reason for what

2   they did, has an additional burden on top of that to show that

3   those aren't accurate, those aren't true.

4           Mr. Minges testified he went to Mr. Campbell.

5   Mr. Minges explained why.  He was 50 feet down the hall.  He

6   was down on the main floor which is better than Mr. St. John,

7   an American born, I think he was.  I don't know if we ever

8   established that he was.  He was down in the basement off the

9   garage.  No windows, anything.  We have no complaints to any of

10  these people for computers, phones, chairs.  In fact, we have

11  e-mails to almost all the way to the governor, we don't have

12  that, but we have the NAACP, Democratic Headquarters, and

13  everything else.  So it's not a shrinking violet that can't

14  stand up for his rights.  He did that.

15          The other witnesses that testified -- and I think

16  Mr. Johnstone, whether he knew the position was vacant or not,

17  he knew that he gave him work to do.  He knew it was

18  satisfactory.  Mr. Wiemer the same way.  He knew the conditions

19  of the location.  You have to -- and Mr. Minges.  So what you

20  have to have to have here is all of these people got together

21  and basically entered into a conspiracy.  Mr. Karney,

22  Mr. Campbell, Mr. Minges, Mr. Johnstone, Miss Johnson all got

23  together, how can we -- what can we do to make sure we

24  discriminate against this person?

25          Bottom issue that you're ultimately going to decide is

1  was there an intentional discrimination of the plaintiff based

2  on his national origin?  We firmly believe there's been no such

3  evidence and you need to return a verdict for the defense.

4          In the last minute I have, on damages, I think when

5  someone doesn't like their job, maybe can't stand their job,

6  some of us are in that position, some of us hopefully are not,

7  you can be upset, you can be disenchanted; but the basis for it

8  is still before you give damages, it has to be based on

9  discrimination.  And the one thing that can't enter into your

10  verdict, and I know it won't, if the plaintiff has not in fact

11  proved discrimination, you can't let sympathy come into play

12  here.  You can't substitute your judgment for the judgment of

13  the City and their business decisions.  That's plain and

14  simple.

15          We know you'll follow the law as provided by Judge

16  Watson.  And in closing, I just want to again thank you.  This

17  is one of the hardest parts of a lawyer, and I'm sure you'll

18  appreciate that, lawyers love to talk.  I have to sit down, I

19  cannot say another word.  I have to -- I will not squirm but I

20  have to listen to Mr. Freking give a ten-minute rebuttal which

21  he has.  I can't get back up here.  So this is my very last

22  opportunity to talk to you, and I'm going to use that to just

23  say thank you.

24          THE COURT:  Thank you, Mr. Giglio.

25          Rebuttal.

1          MR. FREKING:  All right.  What I'd like to do with

2   this final ten minutes is just give you some ideas because when

3   you get back in your jury room, there may be one or more of you

4   who believe there's going to be a defense verdict for a number

5   of reasons, and what I encourage you to do is stick to your

6   convictions.  Make sure you come to a collective decision, the

7   eight of you.

8          Think of some of the points made by the City.  Talked

9   about '92 to 2000 when Mr. Bahar thought he wasn't getting pay

10  increases or they weren't formally making him a project

11  manager.  He did not cry discrimination.  To hear Mr. Giglio

12  and the City talk, he's crying discrimination about everything.

13  No.  He didn't cry discrimination until he met Mr. Campbell.

14  Mr. Campbell told him, I do not like Iranians, and within a

15  very short time, his failure to get somebody to sign off on

16  something allegedly resulted in a referral to the law director.

17          Mr. Giglio makes the point there was no criminal

18  investigation.  Well, there was no criminal investigation, but

19  it was sent up to the law director to see if they could charge

20  him with a crime.  What happened was the law director laughed

21  at the request, sent it back and said this is a work

22  performance issue.  Probably said a few other things under his

23  or her breath.

24          Mr. Giglio and the City suggest that there had to be

25  some kind of conspiracy among all these people.  Nothing could

1    be further from the truth.  We think it all starts and ends

2    with Mr. Campbell and his boss, Mr. Karney.  The importance of

3    the other witnesses is to demonstrate how their articulated

4    reasons are wrong.  They make up a lot of excuses for actions

5    that sound good, but when they're tested, they're either false

6    or they just don't hold any water.

7            He says are these really conflicts in the testimony?

8    Well, yes, because the decision to reclassify these folks after

9    reprimand and EEO complaints starts this story.  And it's very

10   much in Mr. Campbell's interest to say it wasn't my idea, so he

11   points the blame at Johnson and acts like this was an HR thing.

12   Well, HR comes in, they're not part of a conspiracy.  She tells

13   the truth, says it wasn't my idea, these guys came to me.  That

14   is a critical conflict.  A guy is trying to come up with an

15   alibi, and the alibi is disproved.

16           Who came up with the idea to transfer him to

17   wastewater collection?  It's very much in Mr. Campbell's

18   interest to come up with an alibi and say I can't be committing

19   national origin discrimination or retaliation because it was

20   Minges's idea.  Then we have -- ask Mr. Minges under oath in a

21   deposition, he says I have no idea how Mr. Bahar's name came

22   up.

23           Now, these are critical conflicts.  And you've got to

24   look at them and judge why is Mr. Campbell, why are Mr. Karney

25   trying to just distort the truth a little bit?

1          The United States Supreme Court in a case called Hazen

2     Paper said that discrimination is often very subtle and it can

3     even occur unconsciously.  Intentional discrimination can even

4     occur unconsciously according to the United States Supreme

5     Court because people's biases are often well inside their body.

6     Nobody admits a racial bias.  No one admits a sex bias.  Nobody

7     admits an age bias.  Nobody admits they're biased against

8     foreigners.  Actions speak louder than words.  Actions reveal

9     biases.  And you don't have to be burning a cross in order to

10    be accused of being a racist.  It can be more subtle than all

11    of that.  In employment cases, actions against the most senior

12    foreign-born people in MSD speak louder than words.

13          In these cases these are -- these are really -- it's

14    pretty amazing, as I said before, I don't know that I've ever

15    seen a pattern like this in another case.  And I suggest to you

16    that they come up with reasons, oh, that's a lateral move.

17    Again, they're focused on pay.  When you give someone who has

18    120 subordinates and you give them a, quote, special project

19    that has a lot of budgetary figures to it maybe but they have

20    two subordinates, Mr. Huang considered that a demotion.

21          These are four, you know, high-level people within

22    that organization.  Saeed is almost very comparable to

23    Mr. Bahar.  These actions speak louder than words.  They can

24    give you all the denials they want to, but you've got to look

25    at the pattern and say, okay, maybe one or two of these things

1    you could explain but this is all connected to Karney and

2    Campbell, it all occurred within a couple of years, and the

3    City did not come in and give you any evidence of moving

4    Americans like this.  Believe me, if the City had evidence that

5    Americans were moved from positions where they were moved from

6    substantial authority down to virtually no authority, you would

7    have seen it plastered all over this courtroom.  They have the

8    information.  They even made reference to some documents and I

9    say, well, where are those documents?  Guess what, they never

10   appeared.  This pattern speaks volumes, and this reveals the

11   national origin bias, knowingly or unknowingly, of

12   Mr. Campbell.

13          Now, with respect to the retaliation, you've got both

14   national origin discrimination to decide and also retaliation.

15   You will be instructed that timing is critical, is a critical

16   way to prove retaliation.  You have an internal complaint on

17   July 27th of 2000.  Less than a month later he's reclassified,

18   he's transferred to wastewater collection, the last desirable

19   place.  The practice of the City's EEO department was to notify

20   the charged party according to Miss Johnson shortly after a

21   complaint was filed.  So even though Mr. Campbell got on the

22   stand and tried to say I knew nothing about that complaint,

23   Miss Campbell told you what the practice was.

24          No significant work given there.  He filed an EEOC

25   charge.  Again, no significant work done after that.  Another

1    EEOC charge, no significant charge -- work.  And then he is

2    denied the promotion to wastewater engineering.  He's

3    transferred to storm water, no prior experience.

4           Timing means everything in retaliation cases.  You

5    take -- you engage in protected activity and shortly thereafter

6    you're subjected to a series of adverse employment actions.

7    That's what it's all about.

8           And last issue I want to address is the six.

9    Mr. Giglio said, well, there were six people that were

10   reclassified.  When you get back in your jury room and you're

11   talking about this amongst yourselves, just remember two of

12   those six were Mr. Bahar and Mr. Saeed.  The other four were

13   American born.  The other four remained in substantially

14   equivalent positions.  They had title changes.  Mr. Bahar was

15   sent to a less desirable place.  Mr. Saeed went out and got his

16   P.E. license and it took him three court battles, Civil

17   Service, Court of Common Pleas, Court of Appeals battle, to get

18   the promotion that was promised if he got his P.E. license.

19          So you got six people, sure, but you have four that

20   basically stayed where they were, and you have two foreign-born

21   people adversely treated.  Put that together with the pattern

22   that's been displayed.  I think you're going to conclude after

23   careful deliberation -- this is a difficult case, but after

24   careful deliberation you should conclude that Mr. Bahar was a

25   victim of national origin discrimination and he was also the

1    victim of retaliation.

2         We'll leave it to the collective wisdom of the eight

3    of you to determine the remedy that you would give Mr. Bahar.

4         Thank you very much.

5                              * * *

6              EXCERPT OF PROCEEDINGS CONCLUDED

7                              - - -

8

9

10

11

12

13

14

15

16

17                    C E R T I F I C A T E

18         I, Julie A. Wolfer, the undersigned, do hereby

19    certify that the foregoing is a correct transcript

20    from the record of the proceedings in the above-entitled

21    matter.

22

                         s/Julie A. Wolfer
23                       Julie A. Wolfer, RDR, CRR
                         Official Reporter

24

25