# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ALI BAHAR,                          :    Case No. C-1-01-798
                                    :    J. Watson
              Plaintiff,            :
                                    :
      vs.                           :
                                    :
CITY OF CINCINNATI,                 :
                                    :
              Defendant.            :

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL

---

Kelly Mulloy Myers (#0065698)
Randolph H. Freking (#0009158)
Trial Attorneys for Plaintiff
FREKING & BETZ
215 East Ninth Street, Fifth Floor
Cincinnati, OH  45202
(513) 721-1975/(513) 651-2570 (fax)
*kmyers@frekingandbetz.com*
*randy@frekingandbetz.com*

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

On November 20, 2001, Plaintiff Ali Bahar filed a Complaint against Defendant alleging that his employer, the City of Cincinnati, unlawfully discriminated against him based on his national origin and retaliated against him in violation of Title VII during the course and scope of his employment.  (Doc. 1.)  Plaintiff filed a second Complaint alleging Defendant continued to retaliate against him in violation of Title VII on September 27, 2002.  The matters were consolidated and proceeded to trial before a jury on January 19, 2005.  On January 26, 2005, the jury returned a unanimous verdict concluding that Plaintiff had proven by a preponderance of the evidence that the Defendant retaliated against Plaintiff for engaging in protected activity.  (Doc. 71.)  The jury awarded Plaintiff compensatory damages in the amount of $200,000.00.  (Doc. 71.)  The jury found in favor of the Defendant with respect to Plaintiff's claim based on national origin discrimination.  (Doc. 71.)

On February 7, 2005, Plaintiff filed a Motion for Equitable Relief requesting the Court order the Defendant to transfer Plaintiff to the Waste Water Engineering Division ("WWE") of the Metropolitan Sewer District ("MSD") as a Supervising Engineer and order a raise in Plaintiff's compensation to the amount of $70,000 per annum. (Doc. 77.)

On March 10, 2005, this Court granted in part and denied in part Plaintiff's Motion for Equitable Relief.  (Doc. 84.)  The Court ordered that the Defendant transfer Plaintiff as a Senior Engineer with all of the material job responsibilities of a Senior Engineer to the Waste Water Engineering Division within 30 days of the filing date of the Order.  (Doc. 84.)

On March 9, 2005, Defendant filed its Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b).  (Doc. 83.)  On March 18, 2005, Defendant filed its Motion for a New Trial pursuant to Federal Rule of Civil Procedure 59(a).

1

(Doc. 86.)  Defendant's post-trial motions must be denied because there is ample evidence in the record to support the jury's verdict.

## II.    STANDARD OF REVIEW

In reviewing a Motion for Judgment as a Matter of Law under F.R.C.P. 50 and a Motion for New Trial pursuant to Rule 59, the Court may not weigh the evidence, question the credibility of witnesses, or substitute its judgment for that of the jury.  Wehr v. Ryan's Family Steakhouses, 49 F.3d 1150, 1152 (6th Cir. 1995).  The evidence must be viewed in the light most favorable to the non-moving party and the non-movant must be given the benefit of all reasonable inferences.  Id., Williams v. The Nashville Network, 132 F.3d 1123, 1131 (6th Cir. 1997).  The motion should be granted and the jury reversed only if reasonable minds could not come to a conclusion other than one in favor of the movant.  Wehr at 1152, Williams at 1131. The District Court must "indulge all presumptions in favor of the validity of the jury's verdict," and "should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result."  Williams at 1131, citing Brooks v. Toyotomi Company, 86 F.3d 582, 588 (6th Cir. 1996).

## III.    ARGUMENT

A.    **The Defendant's Position That the Plaintiff Failed To Prove A *Prima Facie* Case of Retaliation Is Not Subject To Review In A Post Trial Motion; The Proper Inquiry Must Focus On The Ultimate Question Of Retaliation As Opposed To Whether Plaintiff Established A *Prima Facie* Case.**

Defendant contends that it is entitled to judgment as a matter of law or, alternatively, a new trial because the Plaintiff failed to prove a *prima facie* case of retaliation in that Plaintiff failed to establish that the decision makers for the Defendant had knowledge of Plaintiff's protected activity, that the alleged employment actions were adverse, and that there was evidence of a causal connection between the alleged adverse acts and Plaintiff's

2

protected activity.  Defendant concedes that the Plaintiff engaged in activity protected by Title VII.

It is well settled in the Sixth Circuit that after a trial on the merits, a reviewing Court should not return to a consideration of whether the Plaintiff has proven the elements of the *prima facie* case but should assess the ultimate question of discrimination.  Kovacevich v. Kent State University, 224 F.3d 806, 821-822 (6th Cir. 2000).  (citing EEOC v. Avery Dennison Corp., 104 F3d. 858, 861 (6th Cir. 1997)).  The inquiry into establishment of the *prima facie* case is a preliminary matter which should not be revisited in post trial motions.  Id.  The *prima facie* case is simply a "sensible, orderly way to evaluate the evidence" and bring the case to the central factual inquiry which is whether the Defendant intentionally retaliated against the Plaintiff.  Id. at 823 (citing Ohio State's Postal Service Board v. Aikens, 460 U.S. 711, 715 (1983)).  The appropriate post trial inquiry must focus on the ultimate question of retaliation as opposed to whether the Plaintiff made out his *prima facie* case.  Id. at 825.

The Court may, of course, consider evidence that also bears on the *prima facie* case as long as it does so in order to address the ultimate question of retaliation.  Id.  In reviewing the totality of evidence in the record, it is clear that Plaintiff Bahar introduced sufficient evidence for a reasonable juror to find the Defendant unlawfully retaliated against him for engaging in protected activity.

**1.    A Reasonable Juror Could Find That The Plaintiff Was Well Qualified To Work In The Wastewater Engineering Division Of The Metropolitan Sewer District And Transferring Plaintiff To The Less Desirable Wastewater Collection Division Was Retaliatory, Particularly When The Other Reclassified Engineers In Training Remained In WWE.**

Plaintiff, who holds a Bachelor's Degree in Mechanical Engineering from the

University of Louisville,  was hired by the Defendant in 1988 as an Engineer-in-Training ("EIT").  (Trial Tr. p. 12).  Plaintiff began his career with the City in the Wastewater Treatment Division ("WWT") of the Metropolitan Sewer District ("MSD").  Plaintiff received favorable performance reviews during his tenure as an EIT.  (Trial Tr. p. 12; Trial Ex. PX2). Plaintiff worked as a design engineer from the concept phase of a project through the construction phase.  (Trial Tr. p. 2-127).  Plaintiff was also responsible for the Defendant's flood control facility.  (Trial Tr. p. 2-127).

In 1992, Thomas Quinn, the Director of MSD from 1992 through 1998 (Trial Tr. p. 2-86), created a new Division, the Planning & Program Management, ("PPM") Division.  (Trial Tr. p. 2-87). Quinn appointed Joseph Niehaus as the Superintendent of the new Division and instructed Niehaus to recruit the best and brightest employees he could find for the new Division.  (Trial Tr. p. 2-87).  Plaintiff was one of those elite employees.  (Trial Tr. p. 2-87). Quinn and Niehaus both testified that they considered Bahar to be one of the best Project Managers in the PPM Division.  (Trial Tr. pp. 2-14, 2-87).

During the time Plaintiff was a Project Manager in the PPM Division, he handled most of the Waste Water Treatment Plant capital projects.  (Trial Tr. pp. 2-87-88).  Plaintiff worked with a project from the planning stage through the design and construction phase and completion.  (Trial Tr. p. 2-128).  When the PPM Division was merged back into the Waste Water Engineering Division ("WWE") in 1999, Plaintiff continued to work as an EIT in WWE.  (Trial Tr. pp. 2-129-130).  Pete Schneider, Superintendent of the Wastewater Treatment Division, testified that Plaintiff's position as an EIT carried a very high level of responsibility.  (Trial Tr.  p. 4-114).

Plaintiff's initial protected activity occurred when he sent an electronic communication to MSD's EEO office on July 25, 2000 which stated he believed he had been discriminated

4

against on the basis of his race and indicated that he wished to file an EEO complaint. (Trial Ex. PX6). On July 27, 2000, Plaintiff filed a formal internal EEO Complaint with the Defendant. (Trial Ex. DX2092).

Plaintiff's charge alleged that he was discriminated against on the basis of his race and national origin. Plaintiff noted on the form that the charged party was the Deputy Director, Bob Campbell. (Trial Ex. DX2092). The Defendant's Superintendent of the Wastewater Administration Division, Julia Johnson, testified that the practice of MSD's EEO office was to immediately notify a charged party that a complaint had been filed even before the person might be asked to officially response. (Trial Tr., pp. 40-41). The charge together with a request by the EEO office for a response was formally sent to the Director of MSD, Patrick Karney, on August 22, 2000. (Trial Ex. DX2063).

On August 18, 2000, less than one month after complaining of discrimination and after a successful 12-1/2 year career as an EIT, Plaintiff and five (5) other EITs were reclassified as Senior Engineer Technicians ("CET-4"). (Trial Ex. PX7; Trial Tr. p. 2-139). The purported reason for the reclassification was that the EITs had not obtained their Professional Engineer's license within 10 years ("the ten year rule"). (Trial Tr. pp. 22-23).

> **2.    A Reasonable Juror May Have Determined That The Defendant Retaliated Against Plaintiff Because The City Offered Inconsistent Testimony Regarding The Reasons For The Reclassification.**

The jury could have reasonably concluded that the articulated reasons for the reclassification were unworthy of belief because the Defendant's witnesses offered inconsistent testimony regarding the reclassification. When a Defendant articulates two or more different reasons for taking an adverse employment action, a fact-finder may conclude that the reason articulated is pretextual. Duchon v. Cajon and Company, 791 F.2d 43 (6th Cir. 1986).

In the case at bar, Defendant offered inconsistent testimony as to who initiated the

reclassification of the EITs. Johnson testified that Karney approached Human Resources about the ten year rule. (Trial Tr. p. 4). Karney, on the other hand, testified that Human Resources approached him regarding the ten year rule and indicated that the Department needed to reclassify the employees. (Trial Tr. pp. 4-161, 5-3).

There are further inconsistencies in the record as to why the City suddenly implemented the reclassification when it had not enforced the ten year rule for many years. Plaintiff, for example, had worked as an EIT for 12-1/2 years at the time of the reclassification, well beyond the ten year rule. Johnson testified that the motivation behind the reclassification was that the organization was in need of engineering skills and needed to eliminate the EIT positions so that it could hire licensed engineers. (Trial Tr. p. 22).

Campbell conceded that the Department did not hire any Professional Engineers between the reclassification on August 18, 2000 and December 31, 2000. (Trial Tr. p. 3-170) Campbell also stated that the Department hired only three or four Professional Engineers during the calendar year 2001, even though it had reclassified six. (Trial Tr. p. 3-170). When asked why the EITs needed to be reclassified in order to hire Professional Engineers when the City did not, in fact, do so, Campbell testified that he did not agree with Johnson's testimony. (Trial Tr. p. 3-171).

      **3.**      **A Reasonable Juror Could Find That The Plaintiff Was Well Qualified To Work In The Wastewater Engineering Division Of The Metropolitan Sewer District And Transferring Plaintiff To The Less Desirable Wastewater Collection Division Was Retaliatory, Particularly When The Other Reclassified EITs Remained In WWE And The City Offered Inconsistent Testimony Regarding Why Plaintiff Was Transferred.**

Immediately following Plaintiff's reclassification from an EIT to a CET-4, he was transferred from WWE to the Waste Water Collection ("WWC") Division. (Trial Tr. 2-140). The Defendant concedes that WWC was considered a less desirable division than WWE.

(Trial Tr. p. 3-175).  Unlike Plaintiff, the other reclassified EITs assigned to WWE remained in the Division.  (Trial Tr. pp. 48-49; 3-174).  Before his sudden, unexpected transfer, Plaintiff had no prior experience in WWC which could explain the transfer.  (Trial Tr. p. 2-143).

When asked why Plaintiff was the one reclassified EIT out of four to be transferred out of WWE into WWC, Campbell testified that the Superintendent at WWC "asked for Mr. Bahar."  (Trial Tr., p. 3-175).  Stephen Minges, the WWC Superintendent, testified on direct examination that at the time the EITs were reclassified, the Division had a vacant CET-4 position.  (Trial Tr., p. 4-68).  Minges also testified on direct that he had approached Campbell and specifically requested that Plaintiff be transferred to WWC to fill that position.  (Trial Tr., p. 69-70).

Minges' testimony at trial was completely inconsistent with his sworn testimony in his deposition taken on February 5, 2004.  At trial, Minges specifically remembered approaching Campbell and requesting Bahar, stating as follows:

>   Q.  And during the discussions with Mr. Campbell that resulted in Mr. Bahar being placed in that vacant CET-4 position, who first mentioned Mr. Bahar?
>
>   A.  I went to his office to request him, so I would have – I would have initiated that.

(Trial Tr. p. 4-76).  Minges conceded that his response in deposition was different:

>   Q.  And during the discussions with Mr. Campbell that resulted in Mr. Bahar being placed in that vacant CET-4 position, who first mentioned Mr. Bahar?
>
>   A.  At that time I said: "I don't have any idea."

(Trial Tr. p. 4-77).

### 4.    A Reasonable Juror Could Determine That The Defendant Retaliated Against Bahar When It Stripped Him Of All Meaningful Work.

Upon his arrival to WWC, Plaintiff was assigned to work in a space that had previously been a closet.  (Trial Tr. p. 2-144).  The small space was filled with garbage, did not have a

telephone or computer, and lacked a chair on which the Plaintiff could sit while working. (Trial Tr. p. 2-144-145.)  Even more distressing to Plaintiff was the fact that he was stripped of any meaningful work and was not able to utilize his hard earned engineering expertise.  (Trial Tr. pp. 3-12-13.)

Plaintiff initially reported to Ralph Johnstone.  (Trial Tr. pp. 2-144; 4-54).  In direct contradiction to Minges' testimony, Johnstone testified that when Plaintiff was transferred to WWC, there was no vacant position in the Division.  (Trial Tr. p. 4-54; 4-68).  Consequently, it took some time before Plaintiff was assigned any work.  (Trial Tr. p. 4-54).  Plaintiff was eventually told to shadow Tim Beck, a CET-2 who worked in the Manhole Rehabilitation Program.  (Trial Tr., pp. 3-12-13).  The CET-2 position was two levels lower than Plaintiff's new CET-4 position.  (Trial Tr., p. 3-13).  Plaintiff's assignment did not require any mechanical engineering skills.  (Trial Tr., pp. 3-13; 4-56).

After that assignment, several months passed during which Plaintiff had no work. (Trial Tr., p. 3-13).  Plaintiff was then assigned to report to Jerry Weimer.  (Trial Tr. 3-14). The primary task assigned to Plaintiff during the time he reported to Weimer was map making. (Trial Tr., p. 3-15; 4-63).  Like Plaintiff's previous assignments in WWC, the task of map making did not require any mechanical engineering skills.  (Trial Tr. p. 4-63).

Despite being greatly distressed about the dizzyingly downward spiral of his career, Plaintiff continued to report to work and conscientiously performed his duties, such as they were.  Johnstone believed Plaintiff's performance was good during the time he reported to him. (Trial Tr. p. 4-54).  Weimer was also satisfied with Plaintiff's performance.  (Trial Tr. p. 4-64).

     **5.**    **A Reasonable Juror Could Determine The Defendant Retaliated Against Plaintiff When, After Plaintiff Obtained His PE License, It Refused To Return Him To WWE Even When Vacant Positions Existed In The Division And It Continued to Refuse To Assign Engineering Tasks To Him.**

Determined to return to the engineering work that he loved, Plaintiff took steps to obtain his Professional Engineer license. (Trial Tr. p. 3-15). Plaintiff took the PE exam in October, 2001. (Trial Tr. p. 3-15). Plaintiff received notification on January 12, 2002 that he had passed the exam. (Trial Tr. p. 3-15; Trial Ex. PX11). He immediately advised MSD that he had passed the exam, had obtained his PE license, and requested that he be returned to WWE as a Senior Engineer. (Trial Tr. pp. 3-16-18). Campbell did not want to promote Plaintiff to a Senior Engineer position. (Trial Tr. pp. 3-189-190). The Civil Service Commission ultimately promoted Plaintiff over Campbell's objection on March 31, 2002. (Trial Tr. p. 3-18; 3-189).

Plaintiff's achievement of his long sought after promotion was completely overshadowed by the fact that MSD refused to return him to WWE even though there were vacant positions in the division at the time. (Trial Tr., p. 3-183; 3-190). Even though Campbell knew Plaintiff wanted to return to WWE and knew there were available positions for a Senior Engineer in the Division, Plaintiff was transferred to the Stormwater Management Division ("SMU"), reporting to Sam George. (Trial Tr., pp. 3-183-184; 3-190).

Plaintiff had no prior experience in the Stormwater Division. (Trial Tr. p. 3-19). Upon reporting to SMU, Plaintiff once again found that he had no job responsibilities. (Trial Tr., p. 3-20). Approximately two months after his transfer, Plaintiff was assigned to work on a policy permit application. (Trial Tr., p. 3-20). The project required no mechanical engineering skills. (Trial Tr., p. 3-21). As the project was new and Plaintiff had no experience in SMU, Plaintiff's supervisor recommended to Campbell that Plaintiff be allowed to attend some training courses. (Trial Tr., p. 4-11). Campbell denied the request. (Trial Tr., p. 4-11-12).

After the policy permit application was completed in January, 2003, Plaintiff was assigned the task of receiving complaints from citizens regarding stormwater run-off. (Trial

9

Tr., p. 3-22).  Not surprisingly, the work did not require any mechanical engineering skills.

(Trial Tr., p. 3-22).  As he did in WWC, Plaintiff remained dedicated to performing the tasks

assigned to him.  Plaintiff's supervisor in SMU was satisfied with his performance.  (Trial Tr.,

p. 4-20).

> **6.    A Reasonable Juror Could Find That Campbell's Admission That He Did Not Return Plaintiff To WWE Because He Did Not Trust Him Is Evidence That The Defendant Retaliated Against Plaintiff For Engaging In Protected Activity.**

Campbell admittedly refused to transfer Plaintiff to WWE because he "did not trust

him."  (Trial Tr. p. 3-186).

> Q.  But isn't it true, sir, that what you testified under oath in your deposition was that you didn't bring Mr. Bahar back in the wastewater engineering because you did not trust him?
>
> A.  That is Correct.  We didn't – I did not trust Mr. Bahar to continue – to work in doing what he was previously doing.  I did not trust him.  And that was, again, part of that alternative analysis that we did.
>
> Q.  You did not trust him to do what he had done before very successfully?
>
> A.  That's correct.

(Trial Tr. p. 3-186).  Campbell, of course, knew well before March, 2002 that Plaintiff had

engaged in protected activity in complaining of discrimination on the part of MSD and

Campbell specifically.  (Trial Tr., p. 3-185-186).  This evidence alone is sufficient for a

reasonable juror to have found that the Defendant retaliated against Plaintiff for engaging in

protected activity.

> **B.    Although It Is Not Necessary For Plaintiff To Establish A *Prima Facie* Case Of Retaliation In A Post Trial Motion, There Is Ample Evidence In The Record For Plaintiff To Do So.**

This Court determined that Plaintiff established  material questions of fact, which

would allow a reasonable juror to find in his favor, with respect to the prima facie case of his

retaliation claim when it denied Defendant's Motion for Summary Judgment and denied

Defendant's Motions for Directed Verdict at trial.  Although a further review of the prima facie

case is not necessary in this post trial motion, ample evidence exists in the record to establish

that (1) Plaintiff engaged in conduct protected by Title VII of the Civil Rights Act of 1964; (2)

Defendant knew Plaintiff engaged in protected conduct; (3) Plaintiff was subjected to an

adverse employment action at the time, or after, the protected conduct took place; and (4)

Defendant took an adverse employment action against Plaintiff because of the Plaintiff's

protected conduct.[1]

   1.    **The Evidence Is Ample To Allow A Reasonable Juror To Determine
         That The Defendant Knew Plaintiff Engaged In Protected Activity At
         The Time Of Or After The Protected Activity Took Place.**

On July 27, 2000, Plaintiff filed a formal *internal* EEO Complaint with the Defendant.

(Trial Ex. DX2092).  Plaintiff noted on the form that the charged party was Deputy Director

Campbell.  (Trial Ex. DX2092).  Johnson, testified that the practice of MSD's EEO office was

to immediately notify a charged party that a complaint had been filed even before the person

might be asked to officially response.  (Trial Tr., pp. 40-41).  Based on Johnson's testimony, a

reasonable juror could determine that Campbell knew of the protected activity within days of

July 27, 2000 and certainly prior to Plaintiff's reclassification and transfer to WWC on August

18, 2000.  (Trial Ex. PX7).

The charge and a request by the EEO office for a response was formally sent to the

Director of MSD, Patrick Karney, on August 22, 2000.  (Trial Ex. DX2063).  Defendant

admittedly knew of the protected activity long before it delayed his promotion, refused to

return him to WWE, and refused to assign engineering tasks to him after Plaintiff obtained his

---

[1]Defendant does not contest that Plaintiff has established the first prong of the prima
facie case, that he engaged in protected activity.

PE licence in January, 2002.  (Trial Ex. PX11; Trial Tr. pp. 3-183; 3-190; 3-183-184; 3-190).

> **2.    The Evidence Is Ample For A Reasonable Juror To Determine The Plaintiff Suffered An Adverse Employment Action.**

The Sixth Circuit has repeatedly held that a materially adverse employment action might be indicated by "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, **significantly diminished material responsibilities**, or other indices that might be unique to a particular situation." Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (emphasis added) (6th Cir. 1996), *see also* Ford v. General Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002); Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir. 2004).

The Court of Appeals has recently found that an employee's transfer from a forklift operator job to a standard track laborer job that paid the same as the forklift operator position did constitute an adverse employment action because the new position was more "arduous and 'dirtier'."  White v. Burlington Northern & Santa Fe Railway Co., 364 F.3d 789, 803 (6th Cir. 2004).  The court further noted that the forklift operator position required more qualifications, which indicated it was more prestigious than the laborer job.  Id.

Like White, Plaintiff's transfer from his EIT position to the CET-4 position did not result in a loss of pay.  However there is substantial evidence in the record that his job responsibilities were significantly diminished.  As discussed above, Plaintiff's position as an EIT carried a very high level of responsibility, and he was responsible for significant engineering projects. (Trial Tr.  p. 4-114).  After he was reclassified and transferred to WWC and, later, SMU, Plaintiff's tasks no longer carried any engineering responsibilities.  In fact, Plaintiff testified that there were periods of time after he filed the charge that he did not have any work to do.  A jury could certainly determine from the record that Plaintiff suffered a

material adverse employment action.

>3.    **There Is Ample Evidence Of A Causal Connection Between Plaintiff's Protected Activity And The Adverse Employment Action.**

First, there is a close temporal proximity between Plaintiff's filing of his charge on July 27, 2000 and his reclassification and transfer on August 18, 2000 which would allow the jury to infer a causal connection. Temporal proximity may support an inference of retaliation. Ford v. General Motors Corporation, 305 F.3d 545, 554-555 (6th Cir. 2002) (citing Moon v. Transport Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987)).

Even more compelling than the temporal proximity, however, is the evidence that Campbell did not return Plaintiff to WWE because he didn't trust him. (Trial Tr. p. 3-186). A reasonable juror could certainly infer a causal connection from this evidence.

Finally, there is additional, ample evidence discussed above that Defendant's articulated reason for its actions are pretextual rendering Defendant's Motions without merit.

>C.    **The Court's Jury Instructions Were Not In Error Because They Adequately Informed The Jury Of The Relevant Considerations.**

The Defendant argues that it must be granted directed verdict or, in the alternative, a new trial, because the jury instructions were in plain error with respect to three issues. First, Defendant contends the instructions were in plain error because the jury was not instructed that Plaintiff had the burden to produce evidence that the City's articulated reasons for the adverse employment actions were a pretext. (Defendant's Motion for Judgment as a Matter of Law at p. 17, Defendant's Motion for New Trial at p. 10.) Second, the Defendant argues that the instructions confuse knowledge of the municipality and that of its agents with the knowledge of the decision makers. (Defendant's Motion for Judgment as a Matter of Law at p. 19, Defendant's Motion for New Trial at p. 13.) Finally, the Defendant maintains the instructions were in error because they failed to correctly state the limitation on inference by close

proximity in time. (Defendant's Motion for Judgment as a Matter of Law at p. 19, Defendant's

Motion for New Trial at p. 14.)

1.    **The Defendant Failed To Timely Object To The Jury Instructions Of Which It Now Complains.**

Objections to jury instructions are governed by F.R.C.P. 51. The Rule provides in

relevant part: "... No party may assign as error the giving or the failure to give an instruction

unless that party objects thereto before the jury retires to consider its verdict, stating distinctly

the matter objected to and the grounds of the objection." The rule requires a formal objection

which should in most circumstances be made both before and after the jury instructions are

read to the jury. Bath & Body Works v. Luzier Personalized Cosmetics, Inc., 76 F.3d 743, 749

(6th Cir. 1996). The purpose of this rule is to alert the trial judge to potential problem areas

before the jury retires to deliberate. Id. The Defendant did not object to the instructions it now

claims were erroneous either before or after the instructions were read.

In the absence of a timely formal objection, the instructions are reviewed on appeal for

plain error. Id. at 750. Plain error is an obvious and prejudicial error that requires action in

order to serve the "interests of justice." Reynolds v. Green, 184 F.3d 589, 594 (6th Cir. 1999).

An instruction constitutes plain error when it misapplies the law as to a core issue which results

in substantial prejudice to the party challenging the instruction. Id. at 595, (citing Latsis v.

Chandris, Inc., 20 F.2d 45, 50 (2d Cir. 1994), aff'd, 515 U.S. 347 (1995)).

2.    **The Instruction Pertaining To Plaintiff's Retaliation Claim Was Not In Plain Error As The Sixth Circuit Has Determined It Is Not Necessary That An Instruction Track the *McDonnell Douglas* Paradigm.**

Jury instructions are reviewed as a whole. Williams v. Paint Valley Local School Dist.,

400 F.3d 360, 365 (6th Cir. 2005) (citing Fisher v. Ford Motor Company, 224 F.3d 570, 576

(6th Cir. 2000)). In reviewing jury instructions, "the task of the Court is not to read the

14

instructions word for word  to find an erroneous word or phrase, but rather to 'review the

instructions as a whole in order to determine whether they adequately inform the jury of the

relevant considerations and provide a basis in law for aiding the jury in reaching its decision.'"

Id. at 365 (citing O-So Detroit, Inc. v. Home Insurance Company, 973 F.2d 498, 502 (6th Cir.

1992)).

It is not necessary that a proper jury instruction track the shifting burden of proof

requirement established in McDonnell Douglas and Texas Dept. of Community Affairs v.

Burdine.  Kitchen v. Chippewa Valley Schools, 825, F.2d 1004, 1011-1012 (6th Cir. 1987).  In

fact, a jury instruction which tracks the technical and difficult language of McDonnell Douglas

may very well be confusing to the jurors.  Id. at 1012.  "McDonnell Douglas was not written as

a prospective jury charge; to read its technical aspects to a jury... will add little to the jury's

understanding of the case and, even worse, may lead jurors to abandon their own

judgment and to seize upon poorly understand legalisms to decide the ultimate question of

discrimination."  Id. (citing Loeb v. Textron, Inc., 600 F.2d 103, 1016 (1st Cir. 1979)).

In Kitchen, the employer challenged the jury instruction with respect to the employee's

retaliation claim because the instruction failed to give the shifting burden analysis of Burdine.

Id.  The following instruction was given:  "In order to prove her claim of retaliation, the

Plaintiff must prove by a preponderance of the evidence that first, she initiated an action

seeking relief for conduct that was allegedly sexually discriminatory; and two, that one or more

of the Defendants retaliated against her because she brought those charges; and three, that the

fact that she filed these charges was a likely reason for any adverse conduct by the

Defendants."  Id.  The Sixth Circuit determined that the instruction was proper.  Id.  The Court

noted that the ultimate question before the jury on the retaliation claim was whether the

employer had retaliated against the employee for seeking legal relief for discriminatory

15

conduct. Id. The Court further found that the fact that the Court did not instruct the jury on the shifting burdens of Burdine was not erroneous because the jury's proper concern was with the ultimate question of retaliation and not with the "potentially confusing shifting of evidentiary burdens." Id. (citing Kocenda v. Detroit Edison Company, 139 Mich. App. 721, 363 (1984)).

This Court gave the following instruction with respect to Plaintiff's retaliation claim:

"Plaintiff claims that Defendant intentionally retaliated against him. In order to prevail on this claim, Plaintiff must show all of the following:

(1) Plaintiff engaged in conduct protected by Title VII of the Civil Rights Act of 1964;

(2) Defendant knew Plaintiff engaged in protected conduct;

(3) Plaintiff was subjected to an adverse employment action at the time, or after, the protected conduct took place; and

(4) Defendant took an adverse employment action against Plaintiff because of the Plaintiff's protected conduct."

Further, the Special Interrogatory that the jurors completed and unanimously signed required the jurors to determine if "Plaintiff Ali Bahar proved by a preponderance of the evidence that the Defendant City of Cincinnati retaliated against him because he complained of discrimination."

The instruction given by this Court is strikingly similar to the instruction considered and approved by the Sixth Circuit in Kitchen. The instruction is not plainly erroneous because it advised the jurors as to exactly what they must decide, the ultimate question of Defendant's retaliatory motive. Having failed to show the instruction was in plain error, Defendant's Motions for Judgment as a Matter of Law or a New Trial must be denied.

**3.     The Court's Instruction Imputing Knowledge Of The Defendant's Agents To The Municipality Is Not In Plain Error.**

The Defendant's argument that the jury instructions contain plain error because they confused knowledge of the Defendant municipality and that of its agents without

16

distinguishing the fact that only the knowledge of the decision makers can satisfy the necessary knowledge prong to substantiate a claim of retaliation is without merit. The instruction at issue stated: "A governmental body, which is a legal entity, can act only through its agents; that is, the people who make up the management of the governmental body or others who are agents for the governmental body. If you find that a member of Defendant's management had knowledge of a particular fact, then you should find that Defendant as a governmental body had knowledge of that fact. The knowledge of an agent or manager of a governmental body is said to be 'imputed' to the corporation."

This instruction is routinely used in this district. The instruction merely explains that knowledge on the part of the management employees of the City is imputed to the legal entity which is the actual Defendant in the case. The instruction is not in plain error because it does not misapply the law as to a core issue which results in substantial prejudice to the Defendant. Furthermore, Defendant's argument is particularly specious because the Defendant concedes the decision makers knew of the protected activity at least as of August 22, 2000 when the EEO office sent the Plaintiff's EEO charge to Karney and requested a response. (Tr. Ex. 2063) As discussed above, several of the adverse employment actions undisputedly occurred after the decision makers had knowledge of the protected activity. Thus, the Defendant's Motions must be denied as to this issue.

**4.      The Court's Instruction Regarding The Causal Connection Between the Retaliatory Action And The Protected Activity Was Not In Plain Error.**

The Defendant maintains that the jury instructions were in plain error because they failed to correctly set forth the limitation between causal connection and temporal proximity. The instruction in question stated: "The burden of proving a causal relationship between protected activity in an adverse employment action is not intended to be difficult. In fact,

Plaintiff need only put forth some evidence in order for you to deduce a causal connection between the retaliatory action and the protected activity. Close proximity in time creates an inference of a causal connection between two events." Defendant's position that the instruction allowed the jury to improperly interpret the instruction so as to allow proof of a causal connection to be made solely on the basis of temporal proximity is without merit.

In Nguyen v. City of Cleveland, the Sixth Circuit rejected the Plaintiff's argument that temporal proximity alone was not enough to support a inference of retaliation because the Plaintiff's retaliation case was otherwise weak. 229 F.3d 559, 566-67 (6th Cir. 2000). However, the Court further determined that there may be circumstances where evidence of temporal proximity alone would be sufficient to support an inference of retaliation. Id. at 567. Further, the Sixth Circuit has explained that, although temporal proximity alone will not support an inference of retaliation in the face of compelling evidence to the contrary, the proximity in time of protected activity to an adverse employment action may give rise to an inference of a causal connection. Ford v. General Motors Corporation, 305 F.3d 545, 554-555 (6th Cir. 2002) (citing Moon v. Transport Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987)). The challenged jury instruction is consistent with Sixth Circuit law, does not create substantial prejudice to the Defendant, and is therefore not in plain error.

## IV.    CONCLUSION

For all reasons contained herein, Plaintiff respectfully requests that Defendant's Motion for Judgment as Matter of Law and Motion for New Trial be denied and the jury verdict and judgment be sustained.

Respectfully submitted,


 /s/ Kelly Mulloy Myers
Kelly Mulloy Myers (#0065698)
Randolph H. Freking (#0009158)
Trial Attorneys for Plaintiff
FREKING & BETZ
215 East Ninth Street, Fifth Floor
Cincinnati, OH  45202
(513) 721-1975/(513) 651-2570 (fax)
*kmyers@frekingandbetz.com*
*randy@frekingandbetz.com*


## CERTIFICATE OF SERVICE


I hereby certify that on May 13, 2005, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail, e-mail and/or facsimile to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's System.

 /s/ Kelly Mulloy Myers

19